UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS MCLAIN,

    Plaintiff,

    v.

CITY OF SOMERVILLE,

    Defendant

USDC C.A. No. 04-CV-11833-RCL

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF REASONS WHY MOTION SHOULD BE ALLOWED

#### I.    MOTION

The plaintiff, Thomas McLain, moves the Court for summary judgment in his favor. He submits that there is no genuine dispute over the facts material to his legal claim that the defendant City of Somerville violated his rights under the Uniform Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301 *et seq.*, by declining to select him for initial employment on or about August 31, 2001. He similarly contends there is no genuine dispute as to the facts bearing on remedies and that the Court can resolve that aspect of the case as well via this motion.

#### II.    STATEMENT OF REASONS WHY MOTION SHOULD BE ALLOWED

#### A.    Relevant Summary Judgment Principles.

Rule 56(c) provides in pertinent part that a court may grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See, e.g., Cimon v. Gaffney, 401 F.3d 1, 4 (1st Cir. 2005)("Summary judgment is appropriate only if the record reveals 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law'.").

Familiar rules dictate how to proceed. In moving for summary judgment, McLain first assumes the burden of showing that none of the facts that matter are disputed. See, e.g., Snow v. Harnischfeger Corp., 12 F.3d 1154, 1157 (1st Cir. 1993), cert. denied, 513 U.S. 808.811 (1994) (The moving party has the burden of establishing "the lack of a genuine, material factual issue."). To determine whether he has done so, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party."[1] Stepanischen v. Merchants Despatch Transportation Corp., 722 F.2d 922. 928 (1st Cir. 1983).

What facts ultimately "matter" is determined by the applicable substantive law. See, e.g., Manarite v. City of Springfield, 957 F.2d 953, 955 (1st Cir. 1992)("The materiality of a fact is determined according to the substantive law that governs the dispute."). The Supreme Court has explained in this respect that:

---

[1]     Where, as it is expected will be the case here, there are cross motions for summary judgment, each cross motion is considered independently and the facts are viewed in the light most favorable to the nonmoving party. See Continental Casualty Co. v. Canadian Universal Insurance Co., 924 F.2d 370, 373 (1st Cir. 1991).

2

> "As to materiality, the substantive law will identify
> which facts are material. Only disputes over facts that
> might affect the outcome of the suit under the
> governing law will properly preclude the entry of
> summary judgment. Factual disputes that are
> irrelevant or unnecessary will not be counted."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

As to genuineness, a factual dispute is not considered "genuine" merely

because the other side won't agree to the truth of a particular proposition.

Rather, the test is whether, based on the summary judgment record,[2] "the

evidence is such that a reasonable [factfinder] could return a verdict for the

non-moving party." Anderson v. Liberty Lobby, supra, 477 U.S. at 247.[3]

This aspect of the summary judgment inquiry is also informed and guided

by Local Rule 56.1, which provides that:

> Motions for summary judgment shall include a concise
> statement of the material facts of record as to which
> the moving party contends there is no genuine issue to
> be tried, with page references to affidavits, depositions
> and other documentation. Failure to include such a
> statement constitutes grounds for denial of the
> motion. Opposition to motions for summary judgment
> shall include a concise statement of the material facts
> of record as to which it is contended that there exists a
> genuine issue to be tried, with page references to

---

[2]    The relevant portion of the summary judgment rule, 56(e), provides in
this respect that "When a motion for summary judgment is made and
supported as provided in this rule, an adverse party may not rest upon the
mere allegations or denials of the adverse party's pleading, but the adverse
party's response, by affidavits or as otherwise provided in this rule, must set
forth specific facts showing that there is a genuine issue for trial."

[3]    The Supreme Court has explained regarding "genuineness" that "The
inquiry performed is the threshold inquiry of determining whether there is the
need for a trial -- whether, in other words, there are any genuine factual issues
that properly can be resolved only by a finder of fact because they may
reasonably be resolved in favor of either party." Anderson, supra, 477 U.S. at
250.

> affidavits, depositions and other documentation. . . .
> Material facts of record set forth in the statement
> required to be served by the moving party will be
> deemed for purposes of the motion to be admitted by
> opposing parties unless controverted by the statement
> required to be served by opposing parties.

See, e.g., Stonkus v. City of Brockton School Department, 322 F.3d 97, 102 (1st

Cir. 2003)("Because [summary judgment opponent] did not controvert the

statement of undisputed material facts that the defendants filed with their

summary judgment motion, we deem those facts admitted and consider

whether summary judgment was appropriate.").[4]

## B.    The Applicable Substantive Law.

This is a wrongful "failure to hire" claim that arises under the Uniform

Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301

et seq., commonly referred to as "USERRA." The relevant rights extended in

that act are contained in Section 4311(a), which provides that:

> A person who is a member of, applies to be a member
> of, performs, has performed, applies to perform, or has
> an obligation to perform services in a uniformed service
> shall not be denied initial employment, reemployment,
> retention in employment, promotion, or any benefit of
> employment by an employer on the basis of that
> membership, application for membership, performance
> of service, application for service, or obligation.

See Rogers v. City of San Antonio, 392 F.3d 758, 762 (5th Cir. 2004)

("USERRA's anti-discrimination provision prohibits an employer from denying

initial employment, reemployment, retention in employment, promotion, or any

---

[4]     "A summary judgment is inappropriate where the respondent shows the
existence of a bona fide dispute as to a material fact issue so that a jury or
judge must "resolve the parties' differing versions of the truth at trial."
Computer Systems of America, Inc. v. International Business Mach., 795 F.2d
1086, 1088 (1st Cir. 1988).

benefit of employment to a person *on the basis of* membership, application for membership, *performance of service*, application for service, or *obligation of service*.")(emphasis added).

The declared purposes of USERRA are: (1) "to encourage non-career service in the uniformed services[5] by eliminating or minimizing the disadvantages to civilian employment which can result from such service"; (2) to provide for "the prompt reemployment" of persons returning to civilian jobs from military service and to "minimize the disruption [of their] lives, as well as [to those of] their employers, fellow employees and communities"; and (3) "to prohibit discrimination against persons because of their service in the uniformed services." 38 U.S.C. ß 4301.

The provisions of USERRA are to be broadly construed. See, e.g., Hill v. Michelin N. Am., Inc., 252 F.3d 307, 312-13 (4th Cir. 2001) ("Because USERRA was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries."); McGuire v. UPS, 152 F.3d 673, 676 (7th Cir. 2001) ("USERRA is to be liberally construed in favor of those who served their country.").

In terms of its place in history, "USERRA is the most recent in a series of laws protecting veterans' employment and reemployment rights dating from the Selective Training and Service Act of 1940." Rogers v. City of San Antonio,

---

[5]    "The term 'uniformed services' means the Armed Forces, the Army National Guard and the Air National Guard when engaged in active duty for training, inactive duty training, or full-time National Guard duty, the commissioned corps of the Public Health Service, and any other category of persons designated by the President in time of war or national emergency." 38 U.S.C. ß 4303(16).

supra, 392 F.3d at 762. "USERRA's immediate precursor, the Veterans'
Reemployment Rights Act (VRRA), was enacted as ß 404 of the Vietnam Era
Veterans' Readjustment Assistance Act of 1974."[6] See also DOL Proposed
Regulations Under the Uniformed Services Employment and Reemployment
Rights Act of 1994, 69 FR 56266, to be codified at 20 CFR Part 1001 (Sept. 20,
1994) (hereinafter, "Proposed Regulations"), proposed 69 FR 56266, § 1002.2 –
"Is USERRA a new law?).

Like USERRA, "one of [VRRA's] purposes was to encourage non-career
service in the uniformed services by minimizing the disadvantages to civilian
careers and employment that could result from such service." Gummo v.
Village of Depew, 75 F.3d 98, 105 (2d Cir. 1996).

USERRA did not diminish any veterans' rights under VRRA. It has been
said in this respect that "Congress enacted [USERRA] to replace the VRR Act in
order to "clarify, simplify, and, where necessary, strengthen the existing
veterans' employment and reemployment rights provisions." Gummo, supra,
75 F.3d at 105.

One thing that Congress "clarified" in enacting USERRA was its intent
regarding the applicable burden of proof in cases involving proscribed
employment decisions. In 38 USCS § 4311, entitled "Discrimination against
persons who serve in the uniformed services and acts of reprisal prohibited," it
for the first time expressly fixed the applicable burdens at subsection 1(c),
writing that:

---

[6]     McLain does not believe it necessary for purposes of this case to set forth
the full history of these statutes. That history is, however, set forth in detail in
the Rogers case, supra, 392 F.3d at 764-5.

> [a]n employer shall be considered to have engaged in
> actions prohibited (1) under subsection (a), if the
> person's membership, application for membership,
> service, application for service, or obligation for service
> in the uniformed services *is a motivating factor in the*
> *employer's action, unless the employer can prove that*
> *the action would have been taken in the absence* of
> such membership, application for membership,
> service, application for service, or obligation for
> service".

This change was intended to reverse a portion of Monroe v. Standard Oil Co.,

452 U.S. 549 (1981), a ruling involving VRRA that appeared to hold (and had

been construed by some courts as holding) that in order to prevail, a plaintiff

had to prove that his military obligation was the "sole factor" in the challenged

employment decision. As the Second Circuit explained in Gummo, supra, 75

F.3d at 105, "USERRA was designed to "continue to prohibit discrimination or

acts of reprisal against an employee . . . because of a past, current, or future

military obligation," . . . but it eliminated the "because of" language of §

2021(b)(3), and Congress disavowed the sole-motivation requirement inferred

by Monroe and its progeny."[7]

The Second Circuit further explained that:

> "[e]xplicitly rejecting Monroe, both congressional
> reports stated that courts applying § 4311(b) should
> instead use the scheme of burden-of-proof allocations
> approved by the Supreme Court in NLRB v.
> Transportation Management Corp.[8] . . . for actions
> under the National Labor Relations Act.. . . Under that

---

[7]     The Gummo court recited an excerpt from House report in which the
authors wrote that "To the extent that courts have relied on dicta from the
Supreme Court's decision in [Monroe] that a violation of this section can occur
only if the military obligation is the sole factor, those decisions have
misinterpreted the original legislative intent and history of 38 U.S.C. §
2021(b)(3) and are rejected on that basis."

[8]     426 U.S. 393, 401 (1983).

> scheme, a claimant carries his burden of proving a
> prima facie case of discrimination by showing, by a
> preponderance of the evidence, that his protected
> status was "a substantial or motivating factor in the
> adverse [employment] action"; but the employer may
> nonetheless escape liability by showing, as an
> affirmative defense, that it would have made the same
> decision without regard to the employee's protected
> status.

Gummo, supra, 75 F.3d at 106.[9] See Fink v. City of New York, 129 F. Supp. 2d

511, 520 (E.D.N.Y 2001) ("Military status is a motivating factor if the defendant

relied on, took into account, considered, or conditioned its decision on that

consideration."); Proposed Regulations (same)

Congress also specifically intended that case law developed under VRRA

would continue to apply to USERRA cases. As recently recited in Rogers,

> Congress emphasized USERRA's continuity with the
> VRRA and its intention to clarify and strengthen that
> law. Federal laws protecting veterans' employment
> and reemployment rights for the past fifty years had
> been successful. The large body of case law that had
> developed under those statutes remained in full force
> and effect, to the extent it is consistent with USERRA.

Rogers, supra, 392 F.3d at 762. See also McGuire v. UPS, 152 F.3d 673, 676

(7th Cir. 2001) ("The USERRA replaced [VRRA], but Congress intended for the

case law developed under the VRRA to aid in interpreting the USERRA."), citing

See H.R. Rep. No. 103-65, at 21 (1993), reprinted in 1994 U.S.C.C.A.N. 2249,

---

9        See also Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002);
Barreto v. ITT World Directories, Inc., 62 F. Supp. 2d 387, 390 (D.P.R. 1999)
("A violation of USERRA occurs if the employee's military status is a motivating
factor in the employer's actions, unless the employer can prove that the action
would have been taken in absence of the employee's military appointment.");
Kelley v. Maine Eye Care Assocs. P.A., 37 F. Supp. 2d 47 (D.Me. 1999) ("The
congressional record and courts which have interpreted USERRA indicate that
the burden-shifting framework of the National Labor Relations Act as set forth
in NLRB v. Transportation Management Corp., 462 U.S. 393, 401 (1983) is
applicable to USERRA claims.").

2452 ("The Committee wishes to stress that the extensive body of case law that

has evolved over that period, to the extent it is consistent with the provisions of

this Act, *remains in full force and effect* in interpreting those

provisions.")(emphasis added); Barreto v. ITT World Directories, Inc., 62 F.

Supp. 2d 387, 390 (D.P.R. 1999)("USERRA's legislative history established that

the extensive body of case law that had evolved under VRRA should remain in

full force and effect when interpreting the provisions of USERRA."). Compare

Lapine v. Town of Wellesley, 304 F.3d 90, 100 (1st Cir. 2002) ("[T]he legislative

history accompanying the USERRA was careful to note changes to the law that

represented a deviation from the VRRA.")[10]

One of the court decisions under VRRA that the USERRA enactors

expressly endorsed was Beattie v. The Trump Shuttle, Inc., 758 F. Supp. 30

(D.D.N.Y 1991), a case that McLain submits provides the appropriate analysis

here. The drafters of the House report wrote, in its most relevant part, that

> Current law protects Reserve and National Guard
> personnel from termination from their civilian
> employment or other forms of discrimination based on
> their military obligations. *Section 4311(a) would
> reenact the current prohibition against discrimination
> which includes discrimination against applicants for
> employment, (See Beattie v. The Trump Shuttle, Inc.,*
> 758 F. Supp. 30 (D.D.C. 1991)), . . .

H.R. Rep. 103-65(I)(April 28, 1993). See also Rogers v. City of San Antonio,

supra, 392 F.3d at 768-9; Wrigglesworth v. Brumbaugh, 121 F. Supp. 2d

1126, 1135 (W.D Mich. 2000)(both reciting the just-stated portion of the

---

[10]   The Lapine court also provided a comprehensive account of the military
laws that predated ESERRA. Lapine v. Town of Wellesley, supra, 304 F.3d at
98-100.

House report); Department of Labor, USERRA Advisor[11] ("Your past, present or
future uniformed service duty or obligation must not be a negative factor in
any hiring decision").

Beattie was a "refusal to hire" case and was decided on the plaintiff's
motion for partial summary judgment on the issue of liability. As framed by
the district court, the issue was "whether defendant The Trump Shuttle . . .
violated the [VRRA] by failing to hire plaintiff Beattie, who was fulfilling
military reserve duties at the time of his application for employment." Beattie,
758 F. Supp. 30, 31. The operative statute, 38 U.S.C. ß 2021(b)(3), provided
in relevant part that:

> any person who seeks or holds a position described in
> clause (A) or (B) of subsection (a) of this section shall
> not be denied hiring, retention in employment, or any
> promotion or other incident or advantage of
> employment because of any obligation as a member of
> a Reserve component of the Armed Forces.

The court recited the material facts:

> Trump's offers of employment required that all
> applicants be available for training approximately two
> weeks prior to the scheduled commencement of Trump
> operations on February 1, 1989. Beattie submitted an
> application for employment by the specified deadline of
> December 12, 1988 despite his military commitment,
> which made it impossible for him to begin employment
> by mid-January. In or about December 1988, Trump
> informed Beattie that he would not be hired because of
> his unavailability on the anticipated date of
> commencement of Trump operations.

Id. at 31. The court later wrote:

> the facts in this action may be summarized briefly: (1)
> Trump extended offers of employment to all Eastern

---

[11]     This portion of the Advisory can be found on-line at
www.dol.gov/elaws/vets/userra/empent_c16.asp.

> employees based upon their seniority status; (2)
> Beattie was an Eastern pilot possessing the requisite
> seniority; (3) Trump declined to hire Beattie based
> upon his unavailability on the specified
> commencement date; and (4) Beattie's unavailability
> was caused by his military commitment."

Beattie, supra, 758 F. Supp. at 32.

The court first rejected Trump's defense that Beattie was unprotected

because he was an applicant, not an employee. The court wrote that "the

legislative history . . . confirms what the plain language of the statute makes

clear - that the section protects reservists from discrimination when initially

applying for employment as well as when returning to a previously held

position." Beattie, supra, 758 F. Supp. at 33. Indeed, it later noted that the

relevant rights-granting section of VRRA, ß 2021(b)(3), "was amended in 1986

with the express intention of extending its protection to initial hiring situations.

Prior to 1986, the statute only protected reservists seeking to return to

previously held positions." Id. at 35-36.[12]

After next rejecting Trump's contention that the service-related obligation

that rendered him unavailable was not an "obligation" within the meaning of

VRRA, the court then turned to the legal significance of Beattie's admitted

unavailability to start work when Trump needed him. It wrote:

> Trump argues that it denied Beattie a job because he
> was unavailable, not because he was a reservist. The
> Court does not doubt this to be true . . . But the
> simple fact is that Beattie was unavailable *because of*
> his military duty. The language of ß 2021(b)(3)
> prohibits a reservist from being denied employment
> because of "any obligation as a member of a Reserve

---

[12]   See, e.g., Fox v. Baltimore City Police Department, 201 F.3d 526, 532 (4th Cir. 2000)(("Prior to 1986, VRRA allowed an employer to refuse to hire a worker unless he or she agreed to forego service in the reserves.").

11

> component." . . . *The statute does not condition its
> protection upon the reservist's availability at a time
> specified by the employer.* Although the Court
> sympathizes with Trump's business needs, *Congress
> has, through the VRRA, expressed a policy decision that
> employees and job applicants are to be given
> unconditional protection against discrimination based
> upon their conflicting military duties.* Such a policy
> decision necessarily requires that employers will bear
> the burden of obtaining replacement labor services
> when their employees are fulfilling their reserve duties.
> Congress has chosen to extend such protection to job
> applicants as well as to existing employees, and the
> Court will not read the statute to diminish this
> protection by conditioning it upon the availability of
> the reservist-applicant.

Granting Beattie partial summary judgment on liability, the Court summarized

its rulings in this way:

> Trump's refusal to hire Beattie based upon his military
> obligation was in direct violation of both the language
> and purpose of ß 2021(b)(3). Beattie was under an
> obligation to attend the Industrial College from August
> 1988 until June 1989. The fact that Beattie was
> initially applying for employment . . . is of no
> consequence because the protection of ß 2021(b)(3)
> has been extended to encompass reservists seeking
> employment as well as those seeking to return to
> previous employment. The Court thus concludes that
> Trump did discriminate against Beattie based upon his
> military reserve obligations, and it finds Trump liable
> to Beattie under ß 2021(b)(3) of the VRRA.[13]

Id. at 36.

---

[13]     Another case involving, at least obliquely, the issue of "availability" under
VRRA is Hansen v. Town of Irondequoit, 896 F. Supp. 110, 115 (W.D. N.Y
1995). In that case, a reservist police officer claimed he was passed over for
promotion because his employer feared he would be unavailable due to
upcoming Persian Gulf war, a contention that the employer disputed. Denying
the employer's motion for summary judgment, the court reasoned that "the
statute may apply to a veteran claiming that discrimination based on military
status was a motivating factor in his employer's decision not to promote him.").

Effectively, the Beattie court determined that the employer was required to
treat applicant Beattie *differently* than other applicants who, for reasons other
than their military obligations, may have been unable to start when the
employer needed them. Other courts have recognized this statutory mandate
to treat protected individuals differently from others if necessary to protect
their rights. Compare Fink v. City of New York, 129 F. Supp. 2d 511, 518-9
(E.D.N.Y. 2001) (explaining that "[u]nlike in the usual Title VII context, . . . the
employer must sometimes *treat veterans differently* from other employees in
order to assure that they receive the same benefits as their co-workers" and
noting that USERRA "is conceptually similar to the ADA in this
respect.")(emphasis added).[14]

Beattie appears to be the last court decision addressing the issue of
whether an employer can deny initial employment to an applicant within the
protected class on the basis of the applicant's unavailability. McLain has
found no decided cases since Beattie, under VRRA or USERRA, addressing that
issue. However, the DOL's proposed USERRA regulations are fully consonant
with the reasoning and outcome of that leading case. See Proposed 20 C.F.R. §
1002.18, entitled "What activity is protected from employer discrimination by
USERRA? ("An employer must not deny initial employment, reemployment,
retention in employment, promotion, or any benefit of employment to you on

---

[14]    In Fink, the plaintiff fire fighter had been unable to take a promotional
examination because he was away on military leave on the date of the exam.
Upholding a jury verdict in favor of the firefighter, the court wrote that "where
a neutral employment policy provides that a promotional exam shall only be
administered on a particular date to all employees, it may constitute
discrimination to refuse to allow veterans away on leave on the date in question
to take a make-up exam upon their return from service."

the basis of your membership, application for membership, performance of
service, application for service, or obligation for service in the uniformed
services) and 20 CFR 1002.40, entitled "Does USERRA protect against
discrimination in initial hiring decisions?", which states in relevant part:

> Yes. The Act's definition of employer includes a
> person, institution, organization, or other entity that
> has denied you initial employment in violation of
> USERRA's anti-discrimination provisions. An
> employer need not actually employ you to be your
> "employer" under the Act, if it has denied you initial
> employment on the basis of your membership,
> application for membership, performance of service,
> application for service, or obligation for service in the
> uniformed services. . . . For example, if you have been
> denied initial employment because of your obligations
> as a member of the National Guard or Reserves, the
> company or entity denying you employment is an
> employer for purposes of USERRA. . . .

This regulatory guidance certainly confirms what is otherwise apparent on the

face of the statute and the accompanying committee reports, to wit, USERRA

bars employers from declining to hire a candidate because he is then the

subject of a service obligation.

## C. There Is No Dispute Over The Facts That Matter To McLain's USERRA Claim.

The summary judgment record shows that there is no genuine dispute

over any of the facts that matter under USERRA:

I.   McLain was entitled to USERRA's employment protections: he was a
     person who was both a member of, and had an obligation to perform
     service in, a uniformed service, i.e., the United States Army.[15] See 38
     U.S.C. §4311(a).

---

[15]  See note 5 above for the statutory definition of the term 'uniformed
services'.

II. by virtue of his enlistment contract, he had an "obligation to perform service in a uniformed service".[16]

III. by virtue of his having affirmatively indicated his willingness to accept an appointment to the Somerville Police Department, he was a candidate for "initial employment" with the City.

IV. the City declined to select him on August 31, 2001 specifically because his service obligation rendered him unavailable to start when the City wanted him to start, that is, on October 1, 2001, which was the start of the MCJTC police academy session in South Weymouth.

V. the City would have selected him had he been available to start at the police academy on October 1, 2001.

Those facts establish that on August 31, 2001, the City declined to select

McLain to be a Somerville police officer, thereby denying him initial

employment, because of a service obligation. Since the City cannot prove

[because it is not true] that it would have declined to select him *even if* he had

been available to start on October 1, 2001, McLain is entitled to judgment as a

matter of law. See 38 U.S.C. §4301©(1).

## D. Unavailability Is No Defense Under USERRA.

There is no legal merit to the City's only substantive defense, i.e., that it

could lawfully pass McLain over because he was not going to be *available* on

October 1 to start the particular police academy in which it intended to enroll

those of its new hires who had not previously completed an academy. This was

---

[16] Congress has defined the term "service in the uniformed services" at 38 U.S.C. §4303 (13). The text of this section is already set out above at note 4. It has not separately defined the statutory term "obligation to perform service in a uniformed service." While it does not appear necessary to resolving this case, McLain notes that courts compelled to decide if a particular service responsibility was an "obligation" in the statutory sense have given the term a broad definition. See, e.g., Beattie, supra, 758 F. Supp. at 35-36 (collecting cases on that point).

the same defense considered and rejected in the Beattie case decided under VRRA, and, for the following reasons, it fares no better here.

First, Beattie clearly remains good law: no appellate court has rejected it as a valid construction of VRRA; Congress explicitly cited and endorsed it in its USERRA enactment proceedings in 1994; and the DOL's proposed regulations confirm its central premise.

Second, there is no basis to distinguish Beattie by the text of the respective statutes, because the operative statutory provisions are identical in material part. VRRA provided that "any person who seeks . . . a position . . . shall not be denied hiring . . . because of any obligation as a member of a Reserve component of the Armed Forces". USERRA provides that "A person who . . . has an obligation to perform services in a uniformed service shall not be denied initial employment . . . by an employer on the basis of that. . . obligation." USERRA merely expanded the class of persons whose service obligations could not be held against them in the competition for initial hiring.

Finally, Beattie is virtually indistinguishable on its facts. In both instances, it was the candidates' unavailability, due to their respective service obligations, that doomed their candidacy. Beattie would have been hired had he been able to join the other newly-hired pilots in their training; it is undisputed here that McLain too would have been hired had he been free to join the other newly-hired police offices at the police academy on October 1.

No other relevant distinctions exist. As for the fact that McLain sought public sector employment while Beattie sought employment in the private sector, suffice to say that Congress drew no distinctions in either USERRA or

VRRA; in any event, it has expressly included governmental actors in the definition of "employer" [See 38 U.S.C. 4303(4)(a)].

Nor is there any statutory text suggesting that applicants for public safety employment in general, or law enforcement in particular, are treated any differently than other positions. Congress was free to exempt public safety employers altogether from the prohibition against basing hiring decisions on service-related unavailability, or to insert a "public safety" exception for cases when time was of the essence. It did neither, and thus one would have to add language to the statute [a disfavored step from a statutory construction standpoint] to reach such an outcome. There is no basis for the Court to do so here.

Notably, there is no text in USERRA setting up a "hardship" or "undue burden" defense in the hiring context.[17]  Even assuming for the sake of argument that an "undue hardship" defense could be implied, McLain submits there is no factual basis for its application here. First, the summary judgment record shows that the City was in no appreciable hurry to hire additional officers, so even if it had to wait until McLain was fully available, no "hardship" was presented. The summary judgment record shows in this respect that the City first initiated the hiring process in late 2000, and further shows that although it was permitted as early as February 2001 to make appointments, it

---

[17]    This fact is particularly notable in light of the fact that Congress expressly included a hardship defense in a different context. It provided in this respect at § 4312(d)(1) that "an employer is not required to reemploy a person under this chapter if (A) the employer's circumstances have so changed as to make such reemployment impossible or unreasonable; [or] (B) such employment would impose an undue hardship on the employer."  See, e.g., Wrigglesworth v. Brumbaugh, 121 F. Supp. 2d 1126, 1136 (W.D. Mi. 2001)

17

did not select *any* new officers until the last possible minute, the day [August 31, 2001] the "eligibility list" was set to expire. Even those selections were prompted by a call from HRD reminding the City that any selections would have to be made by the close of business on August 31. The only reasonable inference from those undisputed facts is that the City would not have suffered a hardship if McLain's start date had to be delayed until the completion of his military service.

And even assuming further that the City truly did have pressing staffing needs that would have been impacted by McLain's unavailability until the beginning of 2002, the City still could have accommodated those staffing needs and McLain's USERRA right to not have his military-related unavailability impede his career hopes. In this respect, notwithstanding his unavailability to enroll in the police academy on October 1, it could have lawfully selected him at the same time as the others but simply deferred his actual start date, and, upon his discharge from the service, enroll him in another police academy.

The summary judgment record, as well as relevant state law, shows in this respect that the civil service form provided the City shows that HRD fully contemplates that cities and towns will be hiring candidates who are then in the military; indeed, it expressly provides a place to note such selections. Regarding his state-law mandated training, the record also shows that the provider of that training, the MCJTC, operates police academies throughout the year at various locations in Massachusetts. Thus, the City could have hired McLain on August 31 notwithstanding his remaining military service obligation, and then enrolled him in an academy class that started after he commenced his "transition leave" and returned to Massachusetts. He then

would have simply started his duties upon his successful completion of the academy training.

And even if the City genuinely needed to have the services of one additional police officer *at the very time* that the officers hired on August 31, 2001 would be expected to actually assume their police duties after completing the academy[18], there were still lawful ways for it to accomplish this while respecting McLain's right to not have his service obligation defeat his candidacy. First, it could have simply assigned incumbent police officers to work extra shifts on an overtime basis. While that may have involved extra cost to the City, that would be irrelevant in the absence of any statutory text recognizing cost as a defense.

It also could have made use of a *temporary appointment* for the period of time it would then take for McLain to be ready to join his fellow new hires. Under Massachusetts civil service law, civil service employers may lawfully hire someone on a temporary basis for a variety of reasons. See, e.g., City of Boston v. Boston Police Superior Officers Federation, 52 Mass. App. Ct. 296, 301 (2000)("The police commissioner, as appointing authority for the city, may make temporary appointments pursuant to §§ 7 & 8 of the Civil Service statute (G. L. c. 31)"); Somerville v. Somerville Municipal Employees Ass'n, 20 Mass. App. Ct. 594, 603 n. 14 (1985) ("[a]n acute need for a prompt appointment to fill a vacancy can be satisfied under the Civil Service law in a variety of ways,

---

[18]   The summary judgment record shows that the officers selected on August 31 who had not yet been through a police academy completed the South Weymouth academy in February 2002.

19

including a temporary appointment, a provisional appointment, or an

emergency appointment.").

Indeed, there is even a special Massachusetts law applicable in just this

situation that authorizes public employers to hire candidates who are then in

the military and to appoint a "military substitute" to perform in the job

temporarily until the new hire completes his military service obligation. ALM

Spec L Ch. S35, ß 3 (2004) provides in this respect that

. . .

> *Any person who is in such military* or naval *service and
> who is certified in accordance with the civil service law
> and rules to a permanent office or position classified
> under chapter thirty-one* of the General Laws *may be
> permanently appointed to such office or position and
> employed therein provided* he makes request for
> employment in writing of the appointing authority
> within three months after termination of such military
> or naval service, and files with the division of
> personnel administration the certificate of a registered
> physician that he is not physically disabled or
> incapacitated for performing the duties of the office or
> position. Any such appointment shall be subject to a
> probationary period to be served upon actual
> employment after return from the military or naval
> service. *Any appointment,* transfer or promotion *to fill
> such office or position while he is so serving shall be
> temporary only and shall be filed by a military
> substitute* who shall hold such office or position,
> subject to the same limitations and with the same
> rights as a military substitute appointed under section
> two.

In sum, McLain submits that there are no facts that would even arguably

trigger a "hardship" defense even if USERRA could conceivably be read to

include such a defense in the failure-to-hire context.

## E.   The City's Laches Defense Lacks The Required Factual Basis.

The City has also asserted as an affirmative defense that McLain's claim is barred by the equitable doctrine of laches.[19] See K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 911 (1st Cir. 1989)("[l]aches is an affirmative defense"). While McLain has not yet seen the City's proffered Rule 56.1 fact statement,[20] he affirmatively asserts that there are no material facts that could conceivably be proffered in support of that defense and thus, if raised in the City's Rule 56 papers, it should be rejected as a matter of law.

"The equitable doctrine of laches bars assertion of a claim where a party's delay in bringing suit was 1) unreasonable, and 2) resulted in prejudice to the opposing party." K-Mart, supra, 875 F.2d at 911.[21] See also Miller v. City of Indianapolis, 281 F.3d 648, 653 (7th Cir 2002) (laches is "principally a question of the inequity of permitting a claim to be enforced."); Cook v. City of Chicago,

---

[19]   It is generally understood that USERRA, like its predecessor statutes, has no statute of limitations. See Rogers v. City of San Antonio, supra, 392 F.3d at 772 and n. 36 (noting that "Section 4323 of USERRA does not provide a time limit for bringing a claim for relief, stating only that "no State statute of limitations shall apply to any proceeding under this chapter" and that "The Department [of Labor] has long taken the position that no Federal statute of limitations applied to actions under USERRA.").

[20]   Counsel understood the Court to have directed the parties, at the Rule 16 conference, to address in their primary motion materials all of the issues that were expected to be raised in the case.

[21]   See also Fleet National Bank v. Gray, 375 F.3d 51 (1st Cir. 2004) ("In determining whether laches applies, [courts] ask whether the plaintiff's delay in bringing suit was unreasonable and whether the defendant was prejudiced by the delay."); Iglesias v. Mutual Life Insurance Co., 156 F.3d 237, 243 (1st Cir. 1998) ("The equitable doctrine of laches allows a court to dismiss a claim "where a party's delay in bringing suit was (1) unreasonable, and (2) resulted in prejudice to the opposing party.").

21

192 F.3d 693, 695 (7ᵗʰ Cir. 1999)(defining laches as "an unreasonable delay in pressing one's rights that prejudices the defendant.")

"Laches is different than a statute of limitations; the question is not whether a fixed statutory period of time has run, but whether the delay in bringing suit was unreasonable and prejudicial to the other party." Luvi Trucking, Inc. v. Sea-Land Service, Inc., 650 F.2d 371, 373 (1ˢᵗ Cir. 1981). See also Miller v. City of Indianapolis, supra, 281 F.3d at 653 ("[l]aches is based not on simply the passage of time . . . but rather upon changes of conditions or relationships."); Farries v. Stanadyne/Chicago Div., 832 F.2d 374, 378 (7ᵗʰ Cir. 1987) ("L]aches is based upon changes of conditions or relationships *involved with the claim.*") (emphasis added).

Mere delay – even unreasonable delay – will not support a finding of laches; "[t]here must be a showing of *both* a lack of diligence on the part of the plaintiffs and prejudice to the defendants." Miller, supra, 281 F.3d at 653, citing Costello v. United States, 365 U.S. 265 (1961)(emphasis added).²² See also Whiting v. United States, 231 F.3d 70, 75 (1ˢᵗ Cir. 2000) (laches "require[s] a showing both of unreasonable delay . . . and prejudice . . . ."). Even an *unconvincing* explanation for an *unreasonable* delay will not trigger the application of the doctrine if the defendant fails to show prejudice resulting from the delay. Whiting v. United States, supra, 231 F.3d at 75 (writing that "Whiting's explanation for his three-year delay is unconvincing, . . . but we are not persuaded that the government, which has the burden of proof on both

²² Even when both conditions *have* been proved, a finding of laches is not compelled; rather, "application of the [laches] doctrine is within the 'sound discretion' of the district court". K-Mart, supra, 875 F.2d at 911 (citations omitted).

22