UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THOMAS MCLAIN<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF SOMERVILLE,<br><br>    Defendant | USDC C.A. No. 04-CV-11833-RCL |

**PLAINTIFF'S RULE 56.1 CONCISE STATEMENT
OF THE MATERIAL FACTS OF RECORD AS TO
WHICH HE CONTENDS THERE IS NO GENUINE ISSUE TO BE TRIED**

1.    Thomas McLain is presently employed as a police officer with the Massachusetts Bay Transportation Authority ("MBTA"). Plaintiff's Answers to Defendant's First Set of Interrogatories, No. 1; McLain Affid., ¶1.

2.    In or around May 1999, McLain took and passed a Massachusetts civil service examination for the position of police patrol officer. McLain Affid., ¶3.

3.    On or about January 5, 2000, McLain enlisted in the United States Army for a period of time that was to last until January 4, 2002. McLain Affid., § 4.

4.    From May 2000 until December 6, 2001, McLain was physically stationed at Fort Lewis, Washington State. As of December 6, 2001, he was considered to be on "transitional leave", and he was physically residing in Somerville, Massachusetts. McLain Affid., § 5; Plaintiff's Answers to Defendant's First Set of Interrogatories, No. 1.

5.    When Massachusetts cities and towns that employ police officers through the civil service system wish to hire additional police offices, they must request

authorization from the personnel administrator of the Massachusetts Human Resources Division ("HRD"). If there is at the time of the request a list of candidates eligible for such appointment (known as an "eligible list"), the Personnel Administrator "certifies" to the requesting city or town a list of names of persons that can lawfully be considered for such appointment. The number of names HRD sends is a function of the number of vacancies to be filled. M.G.L. c. 31, §§ 6, 25; Personnel Administration Rule 9 (1988); Boston Police Superior Officers Federation v. City of Boston, 147 F.3d 13, 14 n. 1 (1st Cir. 1998) ("The number of candidates certified by the DPA is determined by the rule of "2n + 1," where "n" equals the number of vacancies for promotion.")

6. On October 12, 2000, the City notified HRD that it wanted to hire five police officers and thus was requesting authorization to do so and a "certification" of names of persons who were eligible for appointment. Lamond Affid., Attach. A.

7. On January 11, 2001, HRD notified the City that it had approved its request for authorization to hire five police officers. At that time, it sent the City a form entitled "Authorization of Employment Form 14" which had a section, then blank, that was to be completed by the City and returned to HRD at such time as the City made its selections. Lamond Affid., Attach. B.[1] See c. 31, § 25.

---

[1] The Form 14 provided to plaintiff's counsel through discovery, attached as Attach. B, contains under "Description of Position to be Filled," "Number of Vacancies," the word "eleven." That entry appears to have been made by the appointing authority at the time it returned the Form 14 after having made its selection. As shown by other attachments to this affidavit, the number of positions the City sought authorization to fill increased from five to seven to ten and finally to eleven.

8.  The Form 14 has a section under the heading "Description of Position to Be Filled" that lists five categories. They include "permanent," "temporary" and "military substitute." A "military substitute" is a type of temporary appointment authorized under civil service law. See ALM Spec L Ch. S35, ß 3 (2004); section 20 of c. 708 of the Acts of 1941; Lamond Affid., Attach. B.[2]

9.  The Form 14 also has an entry directing the hiring entity [here, the City] that "If appointee is in military service, statement to that effect should be made." Lamond Affid., Attach. B.

10. Massachusetts State law permits civil service employers like the City to select a candidate for a permanent appointment even though he is then in the military service and is unavailable to start work at the time of his appointment. ALM Spec L Ch. S35, ß 3 (2004); Lamond Affid., Attach. Q.[3] A civil service

---

[2] See Clement v. Selectmen of Westwood, 316 Mass. 481 (1944) ("By St. 1941, c. 708, the Legislature passed an act to protect the rights of persons employed in the service of the Commonwealth or any political subdivision thereof who had entered the armed services of the United States and to facilitate the temporary appointment of persons to perform their duties during their absence. Section 2 of this act provides for the appointment of military substitutes to take the place of those "holding an office or position classified under chapter thirty-one of the General Laws." It further provides that "All appointments, transfers and promotions made on account of such leaves of absence shall be temporary only and the person so appointed, transferred or promoted shall be known as a military substitute."

[3] That law, entitled "Permanent Appointees Entering or in Military Service; Temporary Appointments, Transfers or Promotions of Military Substitutes", provides in relevant part that: "*Any person who is in such military or naval service and who is certified in accordance with the civil service law and rules to a permanent office or position classified under chapter thirty-one of the General Laws may be permanently appointed to such office or position and employed therein provided* he makes request for employment in writing of the appointing authority within three months after termination of such military or naval service, and files with the division of personnel administration the certificate of a registered physician that he is not physically disabled or incapacitated for performing the duties of the office or position."

employer that selects an eligible candidate even though he or she is in the military and cannot begin work until after the completion of his military service may utilize a temporary replacement in that situation, referred to as a "military substitute." See Lamond Affid., Attachments B and Q; ALM Spec L Ch. S35, ß 3 (2004).[4]

11.  HRD sent the City the Form 14, it also sent the City an "eligible list" that contained the names of the persons who the City could lawfully consider for filling those five vacancies. The "certification number" was 201258 and the "certification date" was January 11, 2001. Lamond Affid., Attach. C.

12.  McLain's name was the fourth on that eligible list, behind candidates David Suied, Arthur Mahoney and John Decourcey. Id. Mr. Suid's name was later ordered removed from the list. See Lamond Affid., Attach. D.

13.  McLain was notified by mail that Somerville was considering appointing police patrol officers and that as an eligible candidate, he needed to signify his interest in being considered for such an appointment. He appropriately did so. McLain Affid., ¶ 6; Lamond Affid., Attach. C.[5]

---

[4] That law provides in relevant part that "Any appointment, transfer or promotion to fill such office or position while he is so serving shall be temporary only and shall be filed by a military substitute who shall hold such office or position, subject to the same limitations and with the same rights as a military substitute appointed under section two."

[5] The form shows McLain checked the box "I will accept the appointment" and signed his name to the right of his typed name.

14. As of January 11, 2001, the City was lawfully free to appoint five new police officers. It did not appoint any new officers at that time. Lamond Affid., Attach. B.[6]

15. In June 2001, the City notified HRD that it wished to increase from 5 to 7 the number of police officers it wished to hire. HRD then authorized the City to hire seven new officers. Lamond Affid., Attach. E. At that time, the City was lawfully free to appoint seven new police officers, but it did not do so. Lamond Affid., Attach. B.

16. Later in June, the City notified HRD that it wished to increase again, from 7 to 10, the number of police officers it wished to hire. On June 26, 2001, HRD authorized that request as well, and on July 4, 2001, issued a supplemental list of additional names of candidates who could lawfully be considered for hire. Lamond Affid., Attachments E, F.

17. As of July 4, 2001, the City was lawfully free to appoint ten new police officers, but it did not make any appointments at that time. Lamond Affid., Attachments F, B.[7]

18. On August 30, 2001, the City again requested to increase the number of police appointments it could make, this time from 10 to 11. HRD granted that request as well. Lamond Affid., Attach. G.

---

[6] Among the information contained on the Form 14 is the "employment date" of the appointed candidates. October 1, 2001 is the "employment date" for all eleven appointees.

[7] Attachment F, the certified list of names, contains an entry ("selection must be of 10 of the first 21 highest who will accept appointment") that shows that HRD had approved the City's request to increase from 7 to 10 the number of new officers it was allowed to hire.

19. During the summer of 2001, HRD notified the various cities and towns that the police officer eligible list would expire on August 31, 2001, and that appointments made from the then-current list would be valid only if signed certifications, and the names of those selected, were received by HRD on or before August 31, 2001, or, in the alternative, were postmarked on or before August 31, 2001. Lamond Affid., Attach. H.

20. As of August 30, 2001, the City still had not appointed any new police officers. Lamond Affid., Attach. B.

21. On August 30, HRD notified the City by phone that any selections it intended to make from the existing list had to be made by August 31, 2001. Lamond Affid., Attach. I.

22. On August 31, 2001, the last day possible, the City notified HRD that it was making eleven permanent appointments to the position of police officer and provided HRD with the names of the selected candidates. Lamond Affid., Attachments B, J and K.[8]

23. Although his name was on the certification and was at the top of the eligible list, McLain was not one of the eleven candidates selected. Lamond Affid., Attach. B, K.

24. In connection with the eleven appointments, the City sent HRD the completed "Authorization of Employment Form 14," having completed the portion of the form with the sub-heading "Notification of Employment Under

---

[8] Attachment K, the "Certification and Report Supplement," has two categories – "Selected" and "Not Selected" which, obviously, reflected whether the listed eligible candidate was or was not selected.

the Above Authorization." The City listed the "employment date" of the eleven selected candidates as October 1, 2001. Lamond Affid., Attach. B.

25.   Persons who are selected for employment as municipal police officers in Massachusetts must attend a course of training before they are entitled to exercise the powers of sworn police officers. See M.G.L. c. 41, § 96B;[9] City of Cambridge v. Cambridge Police Patrol Officers Association, 58 Mass. App. Ct. 522 (2003). Typically, this training is provided at a "police academy" operated under the auspices of the Massachusetts Criminal Justice Training Council ("MCJTC").[10] While new officers attend the academy, they are paid by the sponsoring municipal police department the base weekly salaries of a starting police patrol officer. Id.[11]

26.   Police academy sessions typically run approximately 20 weeks,[12] and are offered throughout the year at various times and at various locations. Lamond Affid., Attach. L.[13]

---

[9]   That section provides in relevant part that ("Every person who receives an appointment to a position on a full-time basis in which he will exercise police powers in the police department of any city or town, shall, prior to exercising police powers, be assigned to and satisfactorily complete a prescribed course of study approved by the department of criminal justice training.").

[10]   The website of the Commonwealth of Massachusetts describes the MPTC as "an agency within the Executive Office of Public Safety [that] is responsible for the provision of all municipal police training within the Commonwealth." See www.mass.gov/mptc/

[11]   c. 41, §96B requires that during the time that a new officer is "assigned to a municipal police training school, [he] shall be paid the regular wages provided for the position to which he was appointed . . .."

[12]   See www.mass.gov/mptc/recruit.htm ("The comprehensive and intensive 800 hour, 20-week training program qualifies recruits as municipal police officers.")

27.  It is up to a police department that has or is considering hiring police officers to decide which academy class it wants its newly-hired officers to attend. C. 41, §96B.

28.  At the same time it notified HRD of its eleven selections, the City filed on behalf of eight of the eleven selected candidates a Massachusetts Criminal Justice Training Council "Application for Enrollment in a Police Academy". The City requested that those selected candidates be enrolled at the Police Academy that was to be held in South Weymouth starting on October 1, 2001. Lamond Affid., Attach. M (1)–(8).[14]

29.  The City did not request the enrollment of three of the selected candidates, because each had previously completed a police academy. Lamond Affid., Attach. N.

30.  The reason why the City did not select McLain was because he was unavailable, on account of his obligations to the United States Army, to participate in the South Weymouth police academy that was to start on October 1, 2001. McLain Affid., ¶ 7 and Attach. A. Had McLain been available

---

[13]  See also Archer v. Town of Saugus, 1994 Mass. Super. LEXIS 32, 90-3605-C (FINDINGS OF FACT, RULINGS OF LAW AND ORDER FOR JUDGMENT, Nov. 18, 1994)("There are several approved academies located throughout the state, including the State Police Academy in Framingham, Criminal Justice Training Council academies in Topsfield and Needham, and municipal academies in Medford, Somerville and Boston. Classes are held regularly on a staggered basis, with the result that the commencement of a class at one of the metropolitan Boston academies is never too far in the future.").

[14]  Those forms as provided in discovery to plaintiff's counsel by counsel for the City contain arguably confidential information. Plaintiff's counsel has thus blocked out such information. In the unlikely event that any of the blocked information is later deemed relevant to the Court's consideration, the parties can arrange to provide unblocked copies for the Court's consideration.

to start the police academy on October 1, 2001, he would have been selected. Id.

31.    The eight selected candidates that had not as of the time of their selection completed a police academy started their police academy training on October 1, 2001, and completed it on February 22, 2002. Lamond Affid., Attach. O; McLain Affid., ¶ 8.

32.    At the completion of the academy, each of the eight attendees was assigned a "final academic grade average," known generally as their "academy score." Lamond Affid., Attach. O. They began performing law enforcement duties as Somerville police officers shortly after February 22, 2002. McLain Affid., ¶ 8.

33.    The three selected candidates who did not attend the October 1, 2001, South Weymouth police academy began performing law enforcement duties as Somerville police officers not long after October 1, 2001, after having completed a brief, "in-house" period of orientation. McLain Affid., ¶ 9.

34.    Under Massachusetts law, the City could have lawfully selected McLain on August 31, 2001 for a permanent appointment even if, because of his service obligations, he was not then available to commence his police training. It could have deferred his starting date until he had fulfilled his military service obligation. Lamond Affid., Attachments P, Q. ALM Spec L Ch. S35, §3 (2004).

35.    If the City had appointed McLain on August 31, 2001 but determined that it needed someone to perform his duties while he was absent on account of his military service obligations, it could have made a "military substitute appointment". Lamond Affid., Attachments P, Q. ALM Spec L Ch. S35, §3. It did not do so in this case. Lamond Affid., Attach. B.

36.  The eleven officers who were selected on or about August 31, 2001 remain on the Somerville police force today.  McLain Affid., ¶ 10.

37.  The MCJTC offered police academies at the following locations that began on the following dates: Agawam, MA. – December 17, 2001;  Boylston, MA.- January 28, 2002; Plymouth, MA. – December 17, 2001; and South Weymouth, MA. – March 4, 2002.  See Lamond Affid., Attach. L.  Each of those academies started after McLain had returned to Massachusetts from active military service, and the City could have enrolled him in any of them had it wished to do so.  McLain Affid., ¶ 5 .

38.  The total annual compensation of Somerville police officers includes a base salary which is set by a collective bargaining agreement between their collective bargaining representative and the City, and a series of pay differentials [extra pay for such things as working at less-desirable shifts, like weekends and nights] and stipends [extra pay, for such things as having a degree, or in recognition of an officer's longevity with the department].  These extra pay provisions are also set out in that collective bargaining agreement.  The total regular salary that officers are paid will differ from officer to officer, depending on such factors as whether the officer has worked at night and on weekends and whether he has a degree.  McLain Affid., ¶ 11.

39.  Somerville police officers are eligible to work on an overtime basis.  When the Police Department decides it needs officers on an overtime basis, as a general rule, it offers these opportunities to the officers in the order of their seniority and based on the number of such hours the officer has already worked, so that such opportunities are apportioned fairly and equitably.  McLain Affid., ¶ 12.

40. Somerville police officers are also eligible to work "paid details" during their off-duty hours. As is the case with overtime, officers are offered the opportunity to work these paid details in order of their seniority and on the number of such hours the officer has already worked. McLain Affid., ¶ 13.

41. The eleven police officers who commenced their employment with the City on or about October 1, 2001 have the same date of hire. However, their relative seniority, for purposes of allocating certain employment benefits such as the order of consideration for overtime opportunities and paid details, is determined by their respective "academy score." McLain Affid., ¶ 14.

42. McLain has completed a police academy, which he attended following his appointment as an MBTA police officer. His academy score is 92. McLain Affid., ¶ 15.

43. During 2002, of the eleven officers who started on or about October 1, 2001, the six highest earners were: Scott Whalen, who was compensated $94,487.94, of which $4,240.13 was for overtime, $29,292.75 was for paid details, and $60,955.06 was base salary; Richard Lavey, who was compensated $5,999.75 in overtime, $32,129.50 for paid details, and $53,593.96 in base salary for a total of $91,723.21; Dominic Pefine, who was compensated $3,651.06 in overtime, $31,583.50 for paid details, and $46,659.18 in base salary for a total of $81,893.74; Walter Collette, who was compensated $1618.30 in overtime, $18,541.00 for paid details, and $51,567.95 in base salary for a total of $71,727.25; James Slattery, who was compensated $3,038.06 in overtime, $18,997.50 for paid details, and $48,244.59 in base salary for a total of $70,280.15;and James Donovan, who was compensated

$4,412.42 in overtime, $13,198.00 for paid details, and $46,230.80 in base salary for a total of $63,841.22.[15]  McLain Affid., ¶ 16 and Attach. B.

44.    During 2002, McLain earned, from all employment, the sum of $35,727. McLain Affid., ¶ 17.

45.    During 2003, the average total annual compensation of all of the eleven officers who started on or about October 1, 2001 was $81,003.  Individually, they earned the following amounts, listed in order of earnings: James Donovan, who received $6,177.95 in overtime, $29,506 in paid details, and $65,269.25 in base salary for a total of $100,953.20; James Slattery, who received $8,139.35 in overtime, $32,722.50 for paid details and $52,701.93 in base salary for a total of $93,563.09; Scott Whalen, who received $4,533.08 in overtime, $34,967.50 for paid details and $51,719.19 in base salary for a total of $91,219.77; Richard Lavey, who received $5,422.22 in overtime, $37,518.25 for paid details and $45,714.52 in base salary for a total of $88,654.99; Dominic Pefine, who received $3,519.88 in overtime, $28,297.00 for paid details and $51,428.98 in base salary for a total of $83,245.86; Sean Sheehan, who received $2,810.81 in overtime, $22,991.50 for paid details and $54,313.16 in base salary for a total of $80,115.47; Marcos Freitas, who received $2,156.74 in overtime, $31,578.00 for paid details and $43,296.25 in base salary for a total of $77,030.99; Jeffrey DiGregorio, who received $3,116.05 in overtime, $11,656.50 for paid details and $60,109.62 in base salary for a total of $74,882.17; Sean Sylvester, who received $3,531.80 in overtime, $17,841 for paid details and $51,425.82 in base salary for a total of $72,798.62; Walter Collette, who received $1,141.76 in overtime, $20,213.50

---

[15] The average total compensation for these six top earners was $78,992.

for paid details and $48,489.21 in base salary for a total of $69,844.47; and Timothy Mitsakis, who received $1,271.16 in overtime, $15,112 for paid details and $42,332.08 in base salary for a total of $58,715.24. McLain Affid., ¶ 16 and Attach. C.

46. During 2003, McLain earned, from all employment, the amount of $33,332.00. McLain Affid., ¶ 18.

47. In March 2005, the Somerville Journal printed an article listing the 2004 pay received by members of the Somerville police department. By 2004, the *average* total annual compensation of the eleven officers who started on or about October 1, 2001 had risen to $99,296.74. McLain Affid., ¶ 16; Attach. D.

48. The highest earner was compensated $123,436.88, while the lowest earner was compensated 76,072.34. Their names, and the breakdown of their compensation, are as follows: Richard Lavey: $71,115.67 base pay; $20,208.71 overtime pay ("OT"); $32,112.50 paid details; **$123,436.38 total compensation**; James Donovan: $72,420.09 base pay; $13,996.97 OT; $31,676.00 paid details; **$118,093.06 total**; Scott Whalen: $70,342.77 base pay; $17,706.74 OT; $29,627.75 paid details; **$117,677.26 total**; James Slattery: $60,347.41 base pay; $14,017.51 OT; $34,945.50 paid details; **$109,310.42 total**; Walter Collette: $71,787.85 base pay; $7,317.66 OT; $16,887 paid details; **$95,992.51 total**; Sean Sheehan: $62,575.69 base pay; $10,246.75 OT; $22,378 details; **$95,200.44 total**; Dominic Pefine: $56,992.60 base pay; $13,317.66 OT; $24,790.50 details; **$95,030.76 total**; Jeffrey DiGregorio: $68,335.39 base pay; $7,740.09 OT; $11,416.50 details; **$87,491.98 total**; Timothy Mitsakis: $75,645.88; $3,306.63 OT; $8,286 details; **$87,238.51 total**; Marcos Freitas: $55,914.11 base pay; $13,369.37

OT; $17,446.50 details; **$86,729.98 total**; Sean Sylvester: $58,465.43 base pay; $9,667.91 OT; $7,939 details; **$76,072.34 total**. McLain Affid., ¶ 16 and Attach. D.

49.   In 2004, McLain received total compensation in the amount of $71,032.59, which was made up of a base salary of $40,113.84 and the rest in the form of paid details and overtime. McLain Affid., ¶ 19.

50.   To date in 2005, McLain has earned $36,492. Of that, $8,985 is attributable to overtime and $8,778 to paid details. McLain Affid., ¶ 20.

51.   Since he became employed by the MBTA police, McLain has attempted to maximize his income by availing himself of as many overtime and paid detail opportunities as possible. McLain Affid., ¶ 21.

52.   Had McLain been employed by the Somerville Police Department, he would have similarly tried to maximize his income by accepting as many overtime and paid detail opportunities as were available. McLain Affid., ¶ 21.

53.   Had McLain been employed by the Somerville Police Department beginning in January 2002, and had he received the same compensation as the top earners of those selected on August 31, 2001, by the end of 2004 he would have received $178,787 more in total compensation than he has received from his other employment.[16]

---

[16]   The sum of the top earners for 2002, 2003 and 2004 is $318,878.02. McLain's total income in those same three years was $140,091. The difference is $181,540.

54.  As of May 1, 2005, the City has not hired any additional police officers since the officers who began on or about October 1, 2001. McLain Affid., ¶ 22.

> For the plaintiff,
>
> By His attorneys,
>
> */s/ James F. Lamond*
> Alan J. McDonald, BBO #330960
> James F. Lamond, BBO #544817
> McDonald & Associates
> Cordaville Office Center
> 153 Cordaville Road, Suite 210
> Southborough, MA  01772
> 508-485-6600

Date: June 10, 2005

### CERTIFICATE OF SERVICE

I, James F. Lamond, hereby certify that I have this day by first-class mail, postage prepaid, served a copy of the foregoing Plaintiff's Rule 56.1 Concise Statement Of The Material Facts Of Record As To Which He Contends There Is No Genuine Issue To Be Tried upon Matthew J. Buckley, Esq., Office of the City Solicitor, City of Somerville, City Hall, 93 Highland Avenue, Somerville, Massachusetts  02143.

Dated: June 10, 2005            */s/ James F. Lamond*
                                James F. Lamond