UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS MCLAIN,

      Plaintiff,

      v.

CITY OF SOMERVILLE,

      Defendant

USDC C.A. No. 04-CV-11833-RCL

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF REASONS WHY MOTION SHOULD BE ALLOWED

### I.    MOTION

The plaintiff, Thomas McLain, moves the Court for summary judgment in his favor. He submits that there is no genuine dispute over the facts material to his legal claim that the defendant City of Somerville violated his rights under the Uniform Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301 *et seq.*, by declining to select him for initial employment on or about August 31, 2001. He similarly contends there is no genuine dispute as to the facts bearing on remedies and that the Court can resolve that aspect of the case as well via this motion.

### II.    STATEMENT OF REASONS WHY MOTION SHOULD BE ALLOWED

### A.    Relevant Summary Judgment Principles.

Rule 56(c) provides in pertinent part that a court may grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[1]  Familiar rules dictate how to proceed.[2]

What facts ultimately "matter" is determined by the applicable substantive law. See, e.g., Manarite v. City of Springfield, 957 F.2d 953, 955 (1st Cir. 1992)("The materiality of a fact is determined according to the substantive law that governs the dispute.").[3]

As to genuineness, a factual dispute is not considered "genuine" merely because the other side won't agree to the truth of a particular proposition. Rather, the test is whether, based on the summary judgment record,[4] "the evidence is such that a reasonable [factfinder] could return a verdict for the non-moving party." Anderson v. Liberty Lobby, supra, 477 U.S. at 247.[5]

This aspect of the summary judgment inquiry is also informed and guided by Local Rule 56.1.[6]

---

[1]    See, e.g., Cimon v. Gaffney, 401 F.3d 1, 4 (1st Cir. 2005).

[2]    See, e.g., Cimon v. Gaffney, supra, 401 F.3d at 4; Snow v. Harnischfeger Corp., 12 F.3d 1154, 1157 (1st Cir. 1993), cert. denied, 513 U.S. 808.811 (1994) and Stepanischen v. Merchants Despatch Transportation Corp., 722 F.2d 922. 928 (1st Cir. 1983).

[3]    See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)

[4]    The movant assumes familiarity with the relevant portion of the summary judgment rule, 56(e).

[5]    See Anderson, supra, 477 U.S. at 250 (regarding "genuineness", "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.")

[6]    See, e.g., Stonkus v. City of Brockton School Department, 322 F.3d 97, 102 (1st Cir. 2003)("Because [summary judgment opponent] did not controvert the statement of undisputed material facts that the defendants filed with their summary judgment motion, we deem those facts admitted and consider whether summary judgment was appropriate.")

**B.    The Applicable Substantive Law.**

This is a wrongful "failure to hire" claim that arises under the Uniform

Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301

*et seq.*, commonly referred to as "USERRA." The relevant rights extended in

that act are contained in Section 4311(a). See Rogers v. City of San Antonio,

392 F.3d 758, 762 (5th Cir. 2004) ("USERRA's anti-discrimination provision

prohibits an employer from *denying initial employment*. . . to a person *on the*

*basis of* membership, . . . *performance of service*, . . . or *obligation of*

*service*.")(emphasis added). The declared purposes of USERRA are expressly

set out at  38 U.S.C. ß 4301.[7] Its provisions are to be broadly construed.[8]

"USERRA is the most recent in a series of laws protecting veterans'

employment and reemployment rights dating from the Selective Training and

Service Act of 1940." Rogers v. City of San Antonio, supra, 392 F.3d at 762.[9]

The purposes of USERRA and its predecessor acts include

"encourag[ing] non-career service in the uniformed services by minimizing the

disadvantages to civilian careers and employment that could result from such

---

[7]    See also 20 CFR PART 1002 APPENDIX, Appendix to Part 1002 – "Your Rights Under USERRA".

[8]    See, e.g., Hill v. Michelin N. Am., Inc., 252 F.3d 307, 312-13  (4th Cir. 2001) ("Because USERRA was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries."); McGuire v. UPS, 152 F.3d 673, 676 (7th Cir. 2001) ("USERRA is to be liberally construed in favor of those who served their country.").

[9]    See also DOL Proposed Regulations Under the Uniformed Services Employment and Reemployment Rights Act of 1994, 69 FR 56266, to be codified at 20 CFR Part 1001 (Sept. 20, 1994) (hereinafter, "Proposed Regulations"), proposed 69 FR 56266, § 1002.2 – "Is USERRA a new law?).

service." Gummo v. Village of Depew, 75 F.3d 98, 105 (2d Cir. 1996). USERRA did not diminish any veterans' rights under its immediate predecessor, VRRA.[10]

In enacting USERRA, Congress resolved a controversy over the applicable burden of proof in these cases by adding 38 USCS § 4311, entitled "Discrimination against persons who serve in the uniformed services and acts of reprisal prohibited," which, at subsection 1(c), expressly fixes the applicable burdens.[11] See, e.g., Gummo, supra, 75 F.3d at 106 ("a claimant carries his burden of proving a prima facie case of discrimination by showing, by a preponderance of the evidence, that his protected status was "a substantial or motivating factor in the adverse [employment] action"; but the employer may nonetheless escape liability by showing, as an affirmative defense, that it would have made the same decision without regard to the employee's protected status."); Fink v. City of New York, 129 F. Supp. 2d 511, 520 (E.D.N.Y 2001) ("Military status is a motivating factor if the defendant relied on, took into

---

[10]    See Gummo, supra, 75 F.3d at 105 ("Congress enacted [USERRA] to replace the VRR Act in order to "clarify, simplify, and, where necessary, strengthen the existing veterans' employment and reemployment rights provisions.").

[11]    This change was intended to reverse a portion of Monroe v. Standard Oil Co., 452 U.S. 549 (1981), a ruling involving VRRA that appeared to hold (and had been construed by some courts as holding) that in order to prevail, a plaintiff had to prove that his military obligation was the "sole factor" in the challenged employment decision. See Gummo, supra, 75 F.3d at 105, ("USERRA was designed to "continue to prohibit discrimination or acts of reprisal against an employee . . . because of a past, current, or future military obligation," . . . but it eliminated the "because of" language of § 2021(b)(3), and Congress disavowed the sole-motivation requirement inferred by Monroe and its progeny. . . ..") The Gummo court also recited an excerpt from House report in which the authors wrote that "To the extent that courts have relied on dicta from the Supreme Court's decision in [Monroe] that a violation of this section can occur only if the military obligation is the sole factor, those decisions have misinterpreted the original legislative intent and history of 38 U.S.C. § 2021(b)(3) and are rejected on that basis."

account, considered, or conditioned its decision on that consideration.");

Proposed Regulations (same).[12] _

Congress also specifically intended that case law developed under VRRA

would continue to apply to USERRA cases.[13]  One of the court decisions under

VRRA that the USERRA enactors expressly endorsed was Beattie v. The Trump

Shuttle, Inc., 758 F. Supp. 30 (D.D.N.Y 1991), a case that McLain submits

provides the appropriate analysis here.  See H.R. Rep. 103-65(I)(April 28,

1993)(" *Section 4311(a) would reenact the current prohibition against*

*discrimination which includes discrimination against applicants for employment,*

*(See Beattie v. The Trump Shuttle, Inc., 758 F. Supp. 30 (D.D.C. 1991)).*[14]

---

[12]    See also Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002);
Barreto v. ITT World Directories, Inc., 62 F. Supp. 2d 387, 390 (D.P.R. 1999)
("A violation of USERRA occurs if the employee's military status is a motivating
factor in the employer's actions, unless the employer can prove that the action
would have been taken in absence of the employee's military appointment.");
Kelley v. Maine Eye Care Assocs. P.A., 37 F. Supp. 2d 47 (D.Me. 1999) ("[T]he
burden-shifting framework of the National Labor Relations Act . . . is
applicable to USERRA claims.").

[13]    See, e.g., Rogers, supra, 392 F.3d at 762 ("Congress emphasized
USERRA's continuity with the VRRA and its intention to clarify and strengthen
that law. . . . The large body of case law that had developed under those
statutes remained in full force and effect, to the extent it is consistent with
USERRA."); Barreto, supra, 62 F. Supp. at 390 ("USERRA's legislative history
established that the extensive body of case law that had evolved under VRRA
should remain in full force and effect when interpreting the provisions of
USERRA."); McGuire v. UPS, 152 F.3d 673, 676 (7th Cir. 2001) ("The USERRA
replaced [VRRA], but Congress intended for the case law developed under the
VRRA to aid in interpreting the USERRA."), citing See H.R. Rep. No. 103-65, at
21 (1993), reprinted in 1994 U.S.C.C.A.N. 2249, 2452 ("The Committee wishes
to stress that the extensive body of case law that has evolved over that period,
to the extent it is consistent with the provisions of this Act, *remains in full force
and effect* in interpreting those provisions."). Compare Lapine v. Town of
Wellesley, 304 F.3d 90, 100 (1st Cir. 2002)  ("[T]he legislative history
accompanying the USERRA was careful to note changes to the law that
represented a deviation from the VRRA.")

[14]    See also Rogers v. City of San Antonio, supra, 392 F.3d at 768-9;
Wrigglesworth v. Brumbaugh, 121 F. Supp. 2d 1126, 1135 (W.D Mich.

Beattie was a "refusal to hire" case and was decided on the plaintiff's motion for partial summary judgment on the issue of liability. As framed by the district court, the issue was "whether defendant The Trump Shuttle . . . violated the [VRRA] by failing to hire plaintiff Beattie, who was fulfilling military reserve duties at the time of his application for employment." Beattie, 758 F. Supp. 30, 31. The operative statute, recited in that case, was 38 U.S.C. ß 2021(b)(3).

The court recited the material facts at pages 31 and 32 of its decision.[15] After doing so, the court rejected Trump's defense that Beattie was unprotected because he was an applicant, not an employee [See Beattie, supra, 758 F. Supp. at 33]; and rejected Trump's contention that the service-related obligation that rendered him unavailable was not an "obligation" within the meaning of VRRA. Finally, it rejected the employer's contention that it did not violate the law because Beattie was not "available" to start work when it needed him. The text of that crucial part of its ruling is contained at page 36, and for space reasons will not be recited here.

The Court summarized its reasons for finding for the plaintiff on the merits:

> Trump's refusal to hire Beattie based upon his military obligation was in direct violation of both the language and purpose of ß 2021(b)(3). Beattie was under an obligation to attend the Industrial College from August

2000)(both reciting the just-stated portion of the House report); Department of Labor, USERRA Advisor ("Your past, present or future uniformed service duty or obligation must not be a negative factor in any hiring decision")(www.dol.gov/elaws/vets/userra).

[15]     McLain will not recite them here for space reasons and will assume they will be consulted as, he maintains, they bear directly on this matter.

6

> 1988 until June 1989.  The fact that Beattie was
> initially applying for employment . . . is of no
> consequence because the protection of ß 2021(b)(3)
> has been extended to encompass reservists seeking
> employment as well as those seeking to return to
> previous employment.  The Court thus concludes that
> Trump did discriminate against Beattie based upon his
> military reserve obligations, and it finds Trump liable
> to Beattie under ß 2021(b)(3) of the VRRA.[16]

Id. at 36.

Effectively, the Beattie court determined that the employer was required to

treat applicant Beattie *differently* than other applicants who, for reasons other

than their military obligations, may have been unable to start when the

employer needed them.  Other courts have recognized this statutory mandate

to treat protected individuals differently from others if necessary to protect

their rights.[17]

Beattie appears to be the last court decision addressing the issue of

whether an employer can deny initial employment to an applicant within the

protected class on the basis of the applicant's unavailability.  However, the

DOL's proposed USERRA regulations are fully consonant with the reasoning

---

[16]    Another case somewhat involving the issue of "availability" under VRRA
is Hansen v. Town of Irondequoit, 896 F. Supp. 110, 115 (W.D. N.Y
1995)(denying summary judgment to employer where reservist police officer
claimed he was passed over for promotion because his employer feared he
would be unavailable due to upcoming Persian Gulf war; "the statute may
apply to a veteran claiming that discrimination based on military status was a
motivating factor in his employer's decision not to promote him.").

[17]    Compare Fink v. City of New York, 129 F. Supp. 2d 511, 518-9 (E.D.N.Y.
2001) (explaining that "[u]nlike in the usual Title VII context, . . . the employer
must sometimes *treat veterans differently* from other employees in order to
assure that they receive the same benefits as their co-workers" and noting that
USERRA "is conceptually similar to the ADA in this respect.")(emphasis added).

and outcome of that leading case.[18] This regulatory guidance certainly confirms what is otherwise apparent on the face of the statute and the accompanying committee reports, to wit, USERRA bars employers from declining to hire a candidate because he is then the subject of a service obligation.

### C. There Is No Dispute Over The Facts That Matter To McLain's USERRA Claim.

The summary judgment record shows that there is no genuine dispute over any of the facts that matter under USERRA:

a)   McLain was entitled to USERRA's employment protections: he was a person who was both a member of, and had an obligation to perform service in, a uniformed service, i.e., the United States Army. See 38 U.S.C. §4311(a).

b)   by virtue of his enlistment contract, he had an "obligation to perform service in a uniformed service".[19]

c)   by virtue of his having affirmatively indicated his willingness to accept an appointment to the Somerville Police Department, he was a candidate for "initial employment" with the City.

---

[18]   See Proposed 20 C.F.R. § 1002.18, entitled "What activity is protected from employer discrimination by USERRA? ("An employer must not deny initial employment, reemployment, retention in employment, promotion, or any benefit of employment to you on the basis of your membership, application for membership, performance of service, application for service, or obligation for service in the uniformed services) and 20 CFR 1002.40, entitled "Does USERRA protect against discrimination in initial hiring decisions?", ["Yes. The Act's definition of employer includes a person, institution, organization, or other entity that has denied you initial employment in violation of USERRA's anti-discrimination provisions. An employer need not actually employ you to be your "employer" under the Act, if it has denied you initial employment on the basis of your membership, application for membership, performance of service, application for service, or obligation for service in the uniformed services. . . . For example, if you have been denied initial employment because of your obligations as a member of the National Guard or Reserves, the company or entity denying you employment is an employer for purposes of USERRA."].

[19]   Congress has defined the term "service in the uniformed services" at 38 U.S.C. §4303 (13). It has not separately defined the statutory term "obligation to perform service in a uniformed service."

d)    the City declined to select him on August 31, 2001 specifically because his service obligation rendered him unavailable to start when the City wanted him to start, that is, on October 1, 2001, which was the start of the MCJTC police academy session in South Weymouth.

e)    the City would have selected him had he been available to start at the police academy on October 1, 2001.

Those facts establish that on August 31, 2001, the City declined to select

McLain to be a Somerville police officer, thereby denying him initial

employment, because of a service obligation. Since the City cannot prove

[because it is not true] that it would have declined to select him *even if* he had

been available to start on October 1, 2001, McLain is entitled to judgment as a

matter of law. See 38 U.S.C. §4301©(1).

### D.    Unavailability Is No Defense Under USERRA.

There is no legal merit to the City's only substantive defense, i.e., that it

could lawfully pass McLain over because he was not going to be *available* on

October 1 to start the particular police academy in which it intended to enroll

those of its new hires who had not previously completed an academy. This was

the same defense considered and rejected in the Beattie case decided under

VRRA, and, for the following reasons, it fares no better here.

First, Beattie clearly remains good law: no appellate court has rejected it

as a valid construction of VRRA; Congress explicitly cited and endorsed it in its

USERRA enactment proceedings in 1994; and the DOL's proposed regulations

confirm its central premise.

Second, there is no basis to distinguish Beattie by the text of the

respective statutes, because the operative statutory provisions are identical in

material part.  USERRA merely expanded the class of persons whose service

obligations could not be held against them in the competition for initial hiring.

Finally, <u>Beattie</u> is virtually indistinguishable on its facts.  In both

instances, it was the candidates' unavailability, due to their respective service

obligations, that doomed their candidacy.  Beattie would have been hired had

he been able to join the other newly-hired pilots in their training; it is

undisputed here that McLain too would have been hired had he been free to

join the other newly-hired police offices at the police academy on October 1.  No

other relevant distinctions exist.[20]

Notably, there is no text in USERRA setting up a "hardship" or "undue

burden" defense in the hiring context.[21]  Even assuming for the sake of

argument that an "undue hardship" defense could be implied, McLain submits

there is no factual basis for its application here.

---

[20]     USERRA expressly applies to both private and public sector employment,
so it does not matter that <u>Beattie</u> arose in the private sector.  <u>See</u> 38 U.S.C.
4303(4)(a)].  Nor is there any statutory text suggesting that applicants for law
enforcement positions are treated any differently than other positions.
Congress was free to exempt public safety employers altogether from the
prohibition against basing hiring decisions on service-related unavailability, or
to insert a "public safety" exception for cases when time was of the essence.  It
did neither.

[21]     This fact is particularly notable because Congress expressly included a
hardship defense in a different context.  It provided in this respect at §
4312(d)(1) that "an employer is not required to reemploy a person under this
chapter if (A) the employer's circumstances have so changed as to make such
reemployment impossible or unreasonable; [or] (B) such employment would
impose an undue hardship on the employer."  <u>See, e.g.</u>, <u>Wrigglesworth v.
Brumbaugh</u>, 121 F. Supp. 2d 1126, 1136 (W.D. Mi. 2001)

First, the summary judgment record shows that the City was in no appreciable hurry to hire additional officers, so even if it had to wait until McLain was fully available, no "hardship" was presented.[22]

Even assuming that the City truly did have pressing staffing needs that would have been impacted by McLain's unavailability until the beginning of 2002, the City still could have accommodated those staffing needs and McLain's USERRA right to not have his military-related unavailability impede his career hopes: it could have lawfully selected him at the same time as the others, but simply deferred his actual start date, and, upon his discharge from the service, enrolled him in another police academy.

Massachusetts civil service law fully contemplates that cities and towns will be hiring candidates who are then in the military; indeed, the form sent to the City expressly provided a place to note such selections. Regarding his state-law mandated training, the record also shows that the provider of that training, the MCJTC, operates police academies throughout the year at various locations in Massachusetts. The City could have hired McLain on August 31 notwithstanding his remaining military service obligation, and then enrolled him in an academy class that started after he commenced his "transition leave"

---

[22]    The summary judgment record shows in this respect that the City first initiated the hiring process in late 2000 and that although it was permitted as early as February 2001 to make appointments, it did not select *any* new officers until the last possible minute, the day [August 31, 2001] the "eligibility list" was set to expire. Even those selections were prompted by a call from HRD reminding the City that any selections would have to be made by the close of business on August 31. The only reasonable inference from those undisputed facts is that the City would not have suffered a hardship if McLain's start date had to be delayed until the completion of his military service.

and returned to Massachusetts.  He then would have simply started his duties upon his successful completion of the academy training.

And even if the City genuinely needed to have the services of one additional police officer *at the very time* that the officers hired on August 31, 2001 would be expected to actually assume their police duties after completing the academy[23], there were still lawful ways for it to accomplish this while respecting McLain's right to not have his service obligation defeat his candidacy.  It could have assigned incumbent police officers to work extra shifts on an overtime basis, and it also could have made use of a *temporary appointment* for the period of time it would then take for McLain to be ready to join his fellow new hires.  Under Massachusetts civil service law, civil service employers may lawfully hire someone on a temporary basis for a variety of reasons.[24]

Indeed, there is even a special Massachusetts law applicable in just this situation that authorizes public employers to hire candidates who are then in the military and to appoint a "military substitute" to perform in the job temporarily until the new hire completes his military service obligation.  See ALM Spec L Ch. S35, ß 3  (2004), attached to McLain's Rule 56.1 Statement.

---

[23]    The summary judgment record shows that the officers selected on August 31 who had not yet been through a police academy completed the South Weymouth academy in late February 2002.

[24]    See, e.g., City of Boston v. Boston Police Superior Officers Federation, 52 Mass. App. Ct. 296, 301 (2000)("The police commissioner . . . may make temporary appointments pursuant to §§ 7 & 8 of . . . (G. L. c. 31)"); Somerville v. Somerville Municipal Employees Ass'n, 20 Mass. App. Ct. 594, 603 n. 14 (1985) ("[a]n acute need for a prompt appointment to fill a vacancy can be satisfied under the Civil Service law in a variety of ways, including a temporary appointment, a provisional appointment, or an emergency appointment.").

In sum, McLain submits that there are no facts that would even arguably trigger a "hardship" defense even if USERRA could conceivably be read to include such a defense in the failure-to-hire context.

### E.    McLain Is Entitled To A Make-Whole Remedy For City's USERRA Breach.

#### 1.    Remedies Available Under USERRA.

If, as McLain maintains, the City breached USERRA by declining to hire him due to his unavailability, he would be entitled to a remedy that restored him, to the fullest extent possible, to where he would be today if his rights had not been violated. McLain submits that the facts that relate to remedy are not in genuine dispute and that accordingly the Court can issue a "make-whole" remedial order under the umbrella of this Rule 56 motion.

Congress has broadly provided for remedies in the event rights under USERRA are not honored, and they apply to public employers in the same manner as private employers. The relevant text is at 38 USCS § 4323(d), (d)(3) and (e).

The task of determining the components of, and actually calculating the amount of, wages and benefits lost due to a discriminatory failure to hire is conceptually no different under USERRA than any other employment discrimination statute, including USERRA's direct predecessors. The goal is to make the plaintiff "whole", that is, to place him as nearly as possible where he would have been had the discriminatory conduct not occurred.[2526]

---

[25]    See, e.g., Duarte v. Agilent Technologies, Inc., 176 L.R.R.M. 3226 (D. Co. 2005) (back pay in USERRA-based wrongful termination suit is what the plaintiff would have earned in the position, minus interim earnings, a severance benefit and unemployment benefits); Novack v. Mackintosh, supra,

Since USERRA provides for lost wages and benefits, making the non-hired applicant "whole" financially clearly requires more than just adding up the *base* pay he has lost and subtracting what he has made in base pay in the same period from other endeavors. Where the position in question is one in which the incumbent would reasonably be expected to receive *extra* compensation, such as overtime compensation, damage awards under remedial employment statutes may include amounts designed to make the plaintiff whole for those losses as well.[27]

---

937 F. Supp. at 883 (VRRA damages are "back wages and *other benefits* which the veteran would have received had she or he been employed, less actual earnings received from other employers during the same period")(emphasis added); Bury v. General Motors Corp., 113 L.R.R.M. 3036 (N.D.Oh. 1982) ("A veteran's lost wages equal the difference between what he would have earned but for his employer's conduct and what he actually earned."). Compare Fuhr v. School District of Hazel Park, 364 F.3d 753, 760-61 (6th Cir. 2004) ("[T]he central purpose of the state and federal anti-discrimination laws . . . is 'to make the person whole for injuries suffered on account of unlawful employment discrimination,' and the general rule is therefore that 'the injured party is to be placed, as near as may be, in the situation she would have occupied if the wrong had not been committed'.")(quoting from Albemarle Paper Co. v. Moody, 422 U.S. 405, 421 (1975); Ingram v. Missouri Pac. R.R., 897 F.2d 1450, 1457 (8th Cir. 1990) (same); Washington v. Davis, 13 Am. Disabilities Cas. (BNA) 1052 (E.D. La. 2002)("Federal anti-discrimination statutes, including the [ADA] . . . provide for equitable relief. The intent of these remedies is to return the plaintiff to the status she would have enjoyed but for the discriminatory acts of the defendant. In other words, the relief should be designed to make the plaintiff "whole.").

[27]    See, e.g., Ricco v. Potter, 377 F.3d 599, 605 (6th Cir. 2004)("back-pay awards often include payment for overtime work that an employee would have performed but for her employer's violation of employment laws."); United States v. City of Warren, 138 F.3d 1083, 1097 (6th Cir. 1998)("lost overtime is a well-established part of a back pay award under Title VII"); EEOC v. Kentucky State Police Department, 80 F.3d a1086, 1100 (6th Cir.)(upholding an award of lost overtime payments granted to prevailing plaintiffs in an ADEA case), *cert. denied*, 519 U.S. 963 (1996); Kossman v. Calumet County, 849 F.2d 1027, 1033-34 (7th Cir 1988) (affirming damages award to ADEA plaintiff that included amount for lost overtime opportunities); Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1562 (11th Cir. 1986)(concluding in Title VII case that "back pay awards . . . should not have been limited to 'straight salary'; interest,

14

Mere uncertainty in determining lost wages and benefits does not bar a supportable claim for damages.  See, e.g., Larch v. Mansfield Municipal Electric Department, 272 F.3d 63 ("Mere uncertainty in the award of damages is not a bar to their recovery . . . .").[28]  What matters instead is the reasonableness of the proposed method for calculating such losses, and that there is a sufficient evidentiary showing that 1) overtime opportunities would have been available to the plaintiff and 2) the plaintiff would have availed himself of those opportunities.[29]

---

overtime, shift differentials, and fringe benefits such as vacation and sick pay should also have been considered in fashioning award."); James v. AMTRAK, 2005 U.S. Dist. LEXIS 5401  (S.D.N.Y. 2005)("There is no doubt that overtime compensation is an allowable component of a back-pay award."); Walker v. Dalton, 89 F. Supp. 2d 20, 26 (D.D.C. 2000)("It is appropriate for a district court to consider overtime in calculating a back-pay award."); Police Commissioner of Boston v. Gows, 429 Mass. 14, 19 (1999) (affirming order that police department compensate  plaintiff for financial loses, including "the overtime and detail pay which she lost" during time she was unlawfully placed on leave of absence); Kraft v. Boston Police Department, 410 Mass. 155 (1991) (affirming superior court judgment in disability discrimination case under M.G.L. c. 151B that had included award of damages to police officer for "lost wages, benefits, *overtime and paid detail[s]*")(emphasis added); Connolly v. Suffolk County Sheriff's Department, 62 Mass. App. Ct. 187, 198 (2004)(c. 151B discriminatee  entitled to damages for lost overtime if he can "demonstrate with reasonable certainty that [he] would have received some overtime shifts and attendant wages had it not been for the" employer's discriminatory conduct).  See also Newton School Committee, 8 MLC 1538, 1556 (1981)(aff'd, School Committee of Newton v. Labor Relations Commission, 388 Mass. 557 (1983)("unlawfully discharged employees are entitled to be compensated for lost overtime opportunities during the back pay period."); Town of Falmouth, 25 MLC 24 (1998)(awarding police officers damages for lost earnings from paid details they were not permitted to work).

[28]     See School Committee of Newton, supra, 8 MLC at 1557 (uncertainty is "an inevitable consequence of attempting to determine what would have transpired had other events not intervened.")

[29]     Compare, e.g., NLRB v. Rice Lake Creamery Co., 365 F.2d 888 (D.C. Cir. 1966) (approving NLRB's method of calculating "back pay" of "taking the average number of straight time *and overtime hours* worked by all full-time employees who performed production work during the back pay period and multiplying this average by the appropriate hourly wage rate for each

### 2.   Specific Remedies:  Instatement With Retroactive Effect.

McLain requests that the Court issue an order requiring the City to hire him forthwith into the position of police officer, with an effective date of August 31, 2001, the date he would have been selected but for his military service obligation.[30]

USERRA specifically empowers the court to require the City to comply with its provisions and gives it broad injunctive powers to do what is necessary to "fully vindicate" rights under this act.  An order directing the City to offer McLain employment as a police officer is thus presumptively appropriate in a wrongful failure-to-hire case.[31]

The Court should also exercise its broad injunctive authority to order that McLain's date of hire be deemed to be the same as those officers actually selected on August 31, 2001, the date he too would have been selected but for

---

discriminatee"); Chemvet Laboratories, Inc. v. NLRB, 497 F.2d 445 (8th Cir. 1974) (enforcing NLRB back pay order "even though amounts of available overtime [is] uncertain"); Intermountain Rural Electrical Association, 317 N.L.R.B. 588, 591 (1995) (deciding that ALJ had erred in *not* awarding damages for lost overtime; writing that "we reject [the ALJ's] "apparent reliance on speculative testimony about whether employees might have refused overtime more often in the past had the overtime been offered to them.").

[30]    See, e.g., Wriggelsworth, supra, 129 F. Supp. 2d at 1109 (reinstatement in USERRA action); Fuhr, supra, 364 F.3d at 761 ("victims of discrimination are presumptively entitled to instatement or reinstatement"); United States EEOC v. W&O, Inc., 619 (11th Cir. 2000)("prevailing Title VII plaintiffs are presumptively entitled to either reinstatement or front pay."); Thurman v. Yellow Freight System, 90 F.3d 1160, 1171 (6th Cir. 1996)("Victims of discrimination are presumptively entitled to instatement or reinstatement in the usual case.").

[31]    While McLain does not concede that it would matter, he notes for the Court that he remains "eligible", from a civil service standpoint, for a civil service appointment to the Somerville police department.  Indeed, he is near the top of the current eligible list.  McLain affid., ¶ 23.

his service-related unavailability. Such an order is necessary to make him "whole," inasmuch as Massachusetts civil service law makes the date that an employee receives a "permanent" appointment relevant for various purposes, including determining the order of layoff.[32]

### 3.    Back Pay, Including Lost Overtime And Paid Details.

There is no genuine dispute over the basic facts that would enable the Court to determine 1) that McLain has suffered economic loss to date because of the City's failure to hire him on August 31, 2001 and 2) the amount of that loss. He thus requests that the Court order the City to make him whole for all such economic losses, and suggests the following calculations are the appropriate measure of those losses.

The fact evidenced in the record as to which there is no genuine dispute fairly permit the inference that if McLain had been hired on August 31, 2001, and been enrolled in a police academy upon his discharge from active duty, he would have started drawing a paycheck from the City no later than January 2002 and would have continued in the City's employ to this time. If those facts had occurred, there is a basis to conclude that he would have received $178,787 more in total compensation that he in fact has received in that period. That amount is comprised of the difference in the respective levels of annual base pay, as well as the earnings attributable to overtime and paid details that it can safely be assumed that he would have received as a Somerville police officer.

---

[32]    See c. 31, §§ 33 and 39.

In the latter respect, the summary judgment record shows that the officers who were hired on August 31, 2001, each had substantial earnings attributable to overtime and especially paid details, opportunities that McLain *would have been entitled to participate in* had he too been on the force during 2002, 2003 and 2004. And the record leaves no room for doubt that McLain would have *availed* himself of those opportunities: in his other police employment, he has regularly sought out and worked as many overtime opportunities and paid details as he could get. The record shows that he has chosen, in essence, to maximize his income rather than devote his time and energy to other non-work pursuits. He asks that the Court order the City to pay him that amount, with appropriate pre-judgment interest added to the resulting sum.

**F.    McLain Is Entitled To Double Damages Because The USERRA Violation Was Willful In The Relevant Sense.**

USERRA provides for doubling a discriminatee's damages in the event "the court determines that the employer's failure to comply with [its] provisions . . . was willful." The Supreme Court has instructed that in the employment discrimination context, "a violation is considered willful if 'the employer . . . knew or showed reckless disregard for the matter of whether its conduct was prohibited by'" the statute in question. <u>Sanchez v. Puerto Rico Oil Co.</u>, 37 F.3d 712, 722 (1ˢᵗ Cir. 1994)(quoting from <u>Trans World Airlines, Inc. v. Thurston</u>, 469 U.S. 111, 126 (1985). The First Circuit has explained further that "[w]illfulness . . . requires an element akin to reckless disregard of, or deliberate indifference to, an employer's [statutory] obligations." <u>Sanchez v.</u>

Puerto Rico Oil Co., supra, 37 F.3d at 722. And the Sanchez court favorably
recited a formulation by a sister circuit that an employer acts with willfulness
when it is "indifferent to the requirements of the governing statute and act[s] in
a purposeful, deliberate, or calculated fashion." Id. at 722, citing Benjamin v.
United Merchants & Mfrs., Inc., 873 F.2d 41, 44 (2d Cir. 1989).

McLain submits that there is an adequate basis in the summary
judgment record for the Court to conclude that the City's failure to comply with
USERRA was willful. City personnel officials knew that McLain was in military
service and that his service obligations would prevent him from starting at the
police academy on October 1, 2001. They apparently took no steps to inform
themselves, from readily available sources,[33] of the City's legal responsibilities
toward eligible applicants who were then in the military or its legal right to
select McLain notwithstanding his temporary unavailability. Even if the City's
hiring officials did not know that USERRA barred it from using McLain's
service-related unavailability as a negative selection factor, or that state civil
service law expressly permitted it to select him notwithstanding that his service
obligation made him temporarily unavailable, such lack of knowledge,
especially when coupled with a failure to even inquire as to what the laws had
to say about this situation, would qualify as just the sort of reckless disregard
for, or indifference to, its legal obligations as to constitute a "willful failure to
comply" with USERRA's provisions.

---

[33]     The very form which accompanied HRD's authorization for it to hire new
police officers, the Form 14, expressly indicated that candidates then in the
military could be hired notwithstanding their military service.

## III.    CONCLUSION AND REQUEST FOR HEARING

For all of the reasons set forth above, the plaintiff submits that he is entitled to judgment in his favor as a matter of law on liability and damages, and requests the issuance of appropriate orders.

Respectfully submitted,

By his attorneys,

James F. Lamond, BBO #544817
Alan J. McDonald, BBO #330960
McDonald & Associates
Cordaville Office Center
153 Cordaville Road, Suite 210
Southborough, MA  01772-1834
(508) 485-6600

Dated:  July 6, 2005

## CERTIFICATE OF SERVICE

I, James F. Lamond, hereby certify that I have this day by first-class mail, postage prepaid, served a copy of the foregoing Plaintiff's Motion For Summary Judgment And Statement Of Reasons Why Motion Should Be Allowed upon Matthew J. Buckley, Esq., Office of the City Solicitor, City of Somerville, City Hall, 93 Highland Avenue, Somerville, Massachusetts 02143.

Dated: July 6, 2005

James F. Lamond (s#)

James F. Lamond