UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
THOMAS MCLAIN,                 )
        Plaintiff,             )
                               )
v.                             )
                               )      CIVIL ACTION NO.
CITY OF SOMERVILLE,            )      04-11833-RCL
        Defendant.             )
_____)

MEMORANDUM AND ORDER
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

LINDSAY, D.J.

## I. INTRODUCTION

The plaintiff Thomas McLain ("McLain") has brought this claim for wrongful "failure to hire" under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301–4333. He asserts that the City of Somerville ("Somerville" or the "City"), Massachusetts, violated his rights under USERRA when it failed to hire him as a police officer in the fall of 2001 because his active service in the United States Army made him unavailable until two months or so after the date set for training. Both McLain and Somerville have moved for summary judgment. For reasons stated below, I GRANT McLain's motion and DENY Somerville's motion.

## II. FACTS

The relevant facts are not in dispute. In May of 1999, McLain passed a Massachusetts civil service examination to become a police patrol officer. (McLain Aff. ¶ 3) On January 5, 2000, he enlisted in the United States Army for a term of service that was to last until January 4,

2002.  (McLain Aff. ¶ 4)  From May 2000 until December 6, 2001, McLain was stationed at Fort Lewis in the state of Washington.  (McLain Aff. ¶ 5)

As it is required to do to initiate the civil service system hiring process, on October 12, 2000, Somerville notified the Massachusetts Human Resources Division ("HRD") that it was seeking to hire five police officers.  (Lamond Aff. Attach. A)  On January 11, 2001, HRD approved Somerville's request for new officers and sent a certified "eligible list" of persons the City could lawfully consider to fill the five vacancies.  (Lamond Aff. Attach. C)  McLain's name was fourth on the list of eligibles.  (*See id.*)  He was notified by mail that he was being considered for appointment as a Somerville police patrol officer, and that he was required to indicate his interest in such an appointment.  (McLain Aff. ¶6; Lamond Aff. Attach. C)  McLain, in turn, properly made known his interest in the appointment.  (McLain Aff. ¶6; Lamond Aff. Attach. C)

As of January 11, 2001, Somerville was authorized to appoint five new police officers, but did not appoint any new officers at that time.  (Lamond Aff. Attach B)  Over the next few months, HRD granted several requests by Somerville to increase the number of authorized appointments, but Somerville made no new appointments.  (Lamond Aff. Attachs. E, G)  Thus, by August 31, 2001, Somerville had eleven vacancies to fill.  (Lamond Aff. Attach B)  On August 30, 2001, HRD informed Somerville that any selections it intended to make from the existing list had to be made by August 31, 2001.  (Lamond Aff. Attach I)

At some point in August, 2001, Somerville Assistant Personnel Director Kathleen DiCaccio ("DiCaccio") spoke to McLain by telephone and informed him that he had been selected as a patrol officer, subject to his ability to attend the required police academy training session set to begin on October 1, 2001.  (DiCaccio Aff. ¶¶ 1, 10)  McLain told DiCaccio that he would still

be on active duty on that date, and that, although he expected he could get early release, he would not be available until at least several weeks after the October 1 start date of the training session. (DiCaccio Aff. ¶¶ 10, 11)  McLain was thereafter informed that Somerville would not hire him because he would not be released from the Army in time to attend the October 1 session of the police academy.  (McLain Aff. ¶ 7 & Attach. A)  Somerville considered McLain an "outstanding candidate" and would have hired him if he had been available to start his training at the police academy on October 1, 2001.  (DiCaccio Aff. ¶¶ 8, 17)  On November 1, 2001, McLain sent a letter to DiCaccio thanking her for her help with the application process and expressing his continued desire to become a Somerville police officer in the future.  (DiCaccio Aff. Attach. B)

Massachusetts law requires new police hires to attend training – usually at a twenty-week session at a police academy – before they may become sworn police officers.  *See* M.G.L. c. 41, § 96B.  With no input from Somerville, the Massachusetts Criminal Justice Training Council ("MJTC") scheduled the eight Somerville hires who had not previously completed police training to attend the October 1 police academy, thus beginning their employment as Somerville police officers.  (DiCaccio Aff. ¶¶ 12, 14)  MJTC conducted a number of police academies shortly after McLain's return to Massachusetts, including two starting December 17, 2001; one starting January 14, 2002; and another starting January 28, 2002.  (Lamond Aff. Attach. L)

As of May 1, 2005, Somerville had done no further hiring of police officers since the hiring at issue in this case.  (McLain Aff. ¶ 22)[1]  All of the police officers who started work on October 1, 2001 are still employed by the Somerville Police Department.  (McLain Aff. ¶ 10)  McLain currently works as a police officer for the Massachusetts Bay Transit Authority, having

---

[1] Somerville's attorney stated at the oral argument of the present motion that Somerville has hired several new police officers within the past few months.

3

completed training at the police academy for this position. (McLain Aff. ¶¶ 2, 15) He remains eligible for appointment as a Somerville police officer. (McLain Aff. ¶ 23)

Five of the other applicants who were not chosen to be Somerville police officers on October 1, 2001 filed appeals with the Massachusetts Civil Service Commission. (Wright Aff. ¶ 3) They settled their claims with the City and the Civil Service Commission approved the settlement agreement. (Wright Aff. ¶ 11) Pursuant to the settlement agreement, Somerville agreed to place the five applicants at the top of the next four regular police appointment certification lists. (Wright Aff. ¶ 9)

### III. DISCUSSION

**A. Standard**

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the court must review the record "in the light most flattering to the nonmovant and indulge all reasonable inferences in that party's favor." *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir. 1997). Cross summary judgment motions do not alter this basic standard; the court must simply consider in turn whether either party is entitled to summary judgment. *De Jesus-Rentas v. Baxter Pharmacy Services Corp.*, 400 F.3d 72, 74 (1st Cir. 2005).

**B. USERRA**

In 1994, Congress enacted USERRA, superseding the Veterans' Reemployment Rights

4

Act of 1968, 38 U.S.C. §§ 2021-2026 (1991) ("VRRA"),[2] in order to "clarify, simplify, and, where necessary, strengthen the existing veterans' employment and reemployment rights provisions."  H.R. Rep. No. 103-65, at 18 (1993).  Congress identified the purposes of USERRA:

> (1) to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service;
>
> (2) to minimize the disruption to the lives of persons performing service in the uniformed services as well as to their employers, their fellow employees, and their communities, by providing for the prompt reemployment of such persons upon their completion of such service; and
>
> (3) to prohibit discrimination against persons because of their service in the uniformed services.

38 U.S.C. § 4301(a).

McLain's basic argument is that Somerville violated his rights under USERRA when it failed to hire him because his military service prevented him from being available on the day Somerville wanted him to start work.  The parties do not dispute that McLain would have been hired had he been available for the training academy on October 1, 2001, and that he was not available on that date because of his active service in the Army.  The sole question is whether USERRA prevents discrimination in initial hiring on the basis of unavailability due to active service in the military.  This appears to be a case of first impression.

The starting point for the legal analysis, of course, is the language of USERRA itself: "[i]f statutory language is plain, permitting only one construction, there is no occasion to seek out

---

[2] In 1992 Congress renumbered the VRRA provisions, *see* 38 U.S.C. §§ 4301–4307 (1992), before replacing the law with USERRA in 1994, Pub. L. No. 103-353, 108 Stat. 3149. To avoid confusion with the provisions of USERRA, I shall cite to the relevant VRRA provisions using the pre-1992 codification.

congressional intent by reference to legislative history or other extrinsic aids." *Lapine v. Town of Wellesley*, 304 F.3d 90, 96 (1st Cir. 2002). The relevant provision of USERRA is § 4311(a), which provides:

> A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

38 U.S.C. § 4311(a). USERRA defines an "employer" as "any person, institution, organization, or other entity that pays salary or wages for work performed," 38 U.S.C. § 4303(4)(A); defines "uniformed services" to include the Army, 38 U.S.C. § 4303(16); and defines "service in the uniformed services" as "the performance of duty on a voluntary or involuntary basis in a uniformed service . . . includ[ing] active duty," 38 U.S.C. § 4303(13).

By USERRA's plain terms, then, Somerville's failure to hire McLain violated the statute: Somerville, a covered employer, denied initial employment to McLain, a member of the Army, because of McLain's obligation to perform service in that uniformed service in the fall of 2001.[3]

Somerville first argues that it did not discriminate against McLain because of his membership in the uniformed services, but rather because of his unavailability to begin work at the time of the assigned police academy. This contention can be dispatched quickly: it ignores the plain language of § 4311(a), which prohibits discrimination based not only on a person's status as

---

[3] 38 U.S.C. § 4311(c) establishes the allocation of burdens of proof under USERRA. Once it has been demonstrated that the employee's membership or obligation to perform service in the uniformed services is a motivating factor in the employer's failure to hire, then the employer bears the burden of proving that it would have made the same decision regardless of the employee's relationship to the uniformed services. *Id.* This procedural scheme is not significant in this case because both parties agree that the sole reason that Somerville did not hire McLain was McLain's unavailability due to his service obligation.

6

a member of the uniformed services, but also on the service member's "obligation to perform service." 38 U.S.C. § 4311(a). McLain was not available on October 1, 2001, because he had an obligation to perform military service on that date.

Somerville next argues that USERRA distinguishes between military personnel on active duty, on the one hand, and national guardsmen and reservists on the other. Somerville claims that the anti-discrimination provision of § 4311 apply only to reservists and guardsmen, while § 4312, which concerns reemployment rights, applies to active duty personnel who have completed their term of service. Somerville points to no statutory language supporting this interpretation of USERRA. By their plain terms, both §§ 4311 and 4312 protect the same category of beneficiaries, people performing service in the "uniformed services," *compare* 38 U.S.C. § 4311(a) *with* 38 U.S.C. § 4312(a). The statute defines the "uniformed services" broadly to include active duty, training, and National Guard duty. *See* 38 U.S.C. §4303(13), (16). It is axiomatic that identical terms within a statute should be given the same meaning. *See Textron Inc. v. Comm'r*, 336 F.3d 26, 33 (1st Cir. 2003).

Somerville argues, however, that "there appears to be a logical presumption that those on active duty are otherwise occupied full time in the service of the country and not available for full-time civilian employment during that very same period." (Somerville's Br. 3.) The statute that USERRA replaced, VRRA, did have a more limited anti-discrimination clause, preventing hiring discrimination only on the basis of a prospective employee's "obligation as a member of a Reserve component of the Armed Forces." 38 U.S.C. § 2021(b)(3) (1991). But by changing the language of the anti-discrimination provision in USERRA, Congress signaled that it intended to change the provision's effect. *See Am. Nat'l Red Cross v. S.G.*, 505 U.S. 247, 263 (1992) (noting the "canon

7

of statutory construction requiring a change in language to be read, if possible, to have some effect . . ."). Although resort to the legislative history of USERRA is unnecessary given the plain naming of its terms, that history removes even the most fanciful doubt as to whether Congress intended the benefits of USERRA to apply to both reservists and active duty personnel: "Under . . . [VRRA], entitlements and eligibility criteria for reemployment rights differ based upon categories of military training or duty.  It is the Committee's view that those distinctions are no longer appropriate for reemployment rights purposes and only lead to confusion and anomalous results in some cases." H.R. Rep. No. 103-65, at 23 (1993).

There is some superficial force, at least, to Somerville's next argument, that McLain's position is unusual.  One would expect, Somerville argues, that most full time members of the Armed Forces are not simultaneously applying for civilian jobs.  Perhaps.  On the other hand, one might ask whether it is any more disruptive for employers to be required to delay permanent hiring than it is to hold a permanent job open for an existing employee who may leave for military service for several years.  The latter is clearly required under § 4312.[4]  Membership in the Reserves or National Guard by no means ensures that a person will not be required to serve a year

---

[4] One difference between § 4311 and § 4312 is that § 4312 imposes a five-year limit on the amount of time a person may be in military service and still retain his reemployment rights, while § 4311 imposes no similar limitation. *Compare* 38 U.S.C. § 4312(a)(2) *with* 38 U.S.C. § 4311.  However, this five-year limitation was only added by 1994 amendment; prior to that time, employers were required to keep positions open for longer periods. *See, e.g.*, *Wrigglesworth v. Brumbaugh*, 121 F. Supp. 2d 1126, 1128, 1140 (W.D. Mich. 2000) (holding under VRRA that service member retained his reemployment rights after 16 years of military leave).  The lack of the five-year limitation in § 4311 does not indicate that § 4311 does not apply to active duty personnel, in view of that section's plain terms.  Furthermore, even if such a five-year limitation were read into § 4311 – contrary to the familiar canon of statutory interpretation that, under these circumstances, the court should presume that Congress' exclusion was intentional, *see Trenkler v. United States*, 268 F.3d 16, 23 (1st Cir. 2001) – McLain would be well within the five-year limit.

or several-year tour of active duty.[5] Furthermore, given the circumstances of this case – Somerville's year-long hiring process, its failure to hire additional police officers for the ensuing four years, and the relatively short delay between when Somerville wanted McLain to begin work and when he was available to start – the policy expressed in § 4311(a) seems entirely reasonable.

The case that comes closest to addressing the issue at hand is *Beattie v. Trump Shuttle, Inc.*, 758 F. Supp. 30 (D.D.C. 1991). Beattie, a colonel in the Air Force Reserves, was on a ten-month leave from his job as an Eastern Airlines pilot to attend military training when Trump Shuttle, Inc. purchased Eastern's shuttle division. *See Beattie*, 758 F. Supp at 31. Trump made employment offers to all of Eastern's employees, contingent on their availability for training at a specified date; Beattie's application was rejected solely because his military training obligation made him unavailable to start work on the date Trump required. *Id.* The court held that Trump's refusal to hire Beattie violated VRRA's provision prohibiting discrimination in hiring on the basis of a Reserve obligation. *Id.* at 36. The court specifically rejected Trump's argument that it denied Beattie a job because he was unavailable and not because of his membership in the Reserves. The court found that Beattie was unavailable due to his obligation to perform military duty, and that VRRA specifically prohibited discrimination based on such an obligation. *Id.* at 34.

While *Beattie* applied VRRA, rather than USERRA, its holding is important to the consideration of the present motion because Congress specifically indicated that it intended

---

[5] Somerville cites *Carney v. Cummins Engine Co.*, which in interpreting VRRA finds that "it is not 'inconceivable' that Congress could have intended to grant reservists greater protection than veterans returning from active duty." 602 F.2d 763, 766 (7th Cir. 1979). While it is certainly not inconceivable that Congress *could* intend to do this, as it appears this is what Congress *did do* under VRRA, all indications in the current law are that Congress did not mean to create such a distinction.

9

USERRA to include the prohibition against discrimination in initial hiring as laid out in *Beattie*. H.R. Rep. No. 103-65, at 23 (1993) ("Section 4311(a) would reenact the current prohibition against discrimination which includes discrimination against applicants for employment (see *Beattie v. The Trump Shuttle, Inc.*, 758 F. Supp. 30 (D.D.C. 1991)) . . ."). Somerville argues that *Beattie* only applies to reservists. But it was VRRA itself that limited the anti-discrimination provision to reservists, not any reasoning in the *Beattie* decision. The logic of *Beattie* – which Congress specifically approved in USERRA – is that an employer may not discriminate in hiring based on a prospective employee's unavailability due to his obligation to perform military service.

Somerville's next thrust is to read an "undue hardship" limitation into § 4311(a), which Somerville says justifies its failure to hire McLain. The reemployment provision, § 4312(d)(1)(A), contains an exception to the reemployment requirement if "the employer's circumstances have so changed as to make such reemployment impossible or unreasonable." Section 4311, on the other hand, includes no such exception. Once again, familiar canons of statutory construction inform the court that the fact that this exception is expressly included in § 4312, but not in § 4311 weighs against reading the exception into § 4311. *See Trenkler v. United States*, 268 F.3d 16, 23 (1st Cir. 2001) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") Even were an undue hardship exception to apply, Somerville construes it far too broadly. The exception of § 4312(d)(1)(A), which the employer bears the burden of proving, applies only "where reinstatement would require creation of a useless job or where there has been a reduction in the work force that reasonably would have included the veteran." *Wrigglesworth v. Brumbaugh*, 121

F. Supp. 2d 1126, 1136 (W.D. Mich. 2000) (quoting *Davis v. Halifax City Sch. Sys.*, 508 F. Supp. 966, 968 (E.D.N.C. 1981)).  Somerville has offered no evidence that this limited exception would apply to it; nor is it plausible on the present record that Somerville has no continuing need for police patrol officers.

Somerville next argues that, as a matter of public safety, it needed to be able to hire the number of police officers it found necessary at the time it deemed necessary.  The slowness with which Somerville progressed in filling these eleven vacancies belies this claim.  Furthermore, there is nothing to suggest that Somerville was precluded from hiring a temporary officer to be replaced by McLain when McLain became available.

**C. Laches**

Somerville finally argues that even if its failure to hire McLain violated USERRA, this lawsuit is barred by the doctrine of laches.  USERRA includes no statute of limitations itself and expressly disclaims the applicability of any state statute of limitations.  38 U.S.C. §4323(i).  The timeliness of McLain's suit is thus governed by the equitable doctrine of laches.  *See K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 911 (1st Cir. 1989) (holding that when a plaintiff's suit is nor barred by any relevant limitations period, the defendant may raise the affirmative defense of laches).  To establish that laches bars McLain's suit, Somerville must establish (1) that McLain unreasonably delayed in bringing suit and (2) that this delay prejudiced Somerville.  *See id.*

Somerville points to certain time periods mentioned elsewhere in USERRA than § 4311 in support of its claim that McLain unreasonably delayed in filing suit.  For example, to preserve his reemployment rights under § 4312 a returning member of the military services is required to apply

to his employer for reinstatement within ninety days of the completion of his service period. 38 U.S.C. § 4312(e)(1)(D). Again, customary canons of statutory construction indicate that the absence of a similar limitation period in § 4311 weighs against reading in such a limitation. *See Trenkler v. United States*, 268 F.3d at 23. Furthermore, in reemployment cases, timely notification after the service member ends his military obligation is necessary to alert the employer that the employee wants to resume his employment following the completion of his military service. In the case at bar, McLain notified Somerville that he sought employment when he applied to be a patrol officer. USERRA did not require him to notify Somerville a second time after he was discharged from the Army.

Somerville points out that employment discrimination statutes usually employ relatively short time limitations, citing the six-month limitations period for filing a discrimination complaint under M.G.L. c. 151B, § 4. Given that Congress not only declined to impose a limitations period for USERRA discrimination claims but specifically disclaimed the applicability of state statutes of limitations, 38 U.S.C. § 4323(i), it is not reasonable to assume similar limits would apply here.

Nothing in the record of this case shows that McLain's three-year delay in filing suit is so unreasonable as to bar the progress of this suit. *See Petry v. Delmarva Power & Light Co.*, 632 F. Supp. 1532, 1534 (D. Del. 1986) (holding four-year delay in bringing a VRRA claim did not justify the application of laches where the defendant could not demonstrate any prejudice).

Furthermore, Somerville has produced no evidence of prejudice due to McLain's delay. The prejudice contemplated under the doctrine laches may be either economic or evidentiary. *See Giese v. Pierce Chemical Co.*, 29 F. Supp. 2d 33, 38 (D. Mass. 1998). There is no allegation that McLain's delay has resulted in the loss of witnesses or evidence necessary to the resolution of his

claim; to the contrary, both parties agree that there are no genuine issues of material fact. *Compare Miller v. City of Indianapolis*, 281 F.3d 648, 653-54 (7th Cir. 2002) (applying laches to bar a USERRA claim based on decades-old events where key witnesses had died or retired). Nor has Somerville produced evidence of any economic harm it has suffered due to this delay. At most, the doctrine of laches would only apply to limit any award of back pay; it would not bar McLain's claims completely. *See Cook v. City of Chicago*, 192 F.3d 693, 694-96 (7th Cir. 1999) (in an employment suit, applying laches to limit an award of back pay to four years where employee had waited ten years to file suit); *Herman v. City of Chicago*, 870 F.2d 400, 401-02 (7th Cir. 1989) (holding that laches may not bar an employment claim filed nineteen months after the claim arose simply because the plaintiff requests back pay); *Cornetta v. United States*, 851 F.2d 1372, 1380-83 (Fed. Cir. 1988) (holding that plaintiff's request for back pay cannot on its own support a finding of laches, as otherwise there would effectively be a shorter statute of limitations than Congress intended in employment claims).

### IV.  Conclusion

Because there are no genuine issues of material fact with respect to the issue of liability, and because McLain is entitled to judgment as a matter of law, I GRANT summary judgment in his favor on the issue of liability and DENY Somerville's motion for summary judgment. Because there remain disputed issues of fact pertaining to the appropriate remedy, including the amount of damages, if any, due to McLain, the clerk shall set this case for a final pretrial conference.

SO ORDERED.

        /s/ REGINALD C. LINDSAY

        United States District Judge

DATED: March 31, 2006